52 P.3d 255

Jane DOE, Plaintiff–Appellant–
Respondent,

v.

John DOE, Defendant–Appellee–
Petitioner,

and

John Doe II, Defendant–Appellee–
Respondent.

No. 22172.

Supreme Court of Hawai'i.

July 10, 2002.

Barry D. Edwards, Honolulu, for defendant-appellee-petitioner, on the writ.

Mark Van Pernis (of Van Pernis, Smith & Vancil), Kailua Kona, for plaintiff-appellant-respondent.

Alan H. Tuhy, guardian ad litem.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.; RAMIL and ACOBA, JJ., not Joining.[1]

Opinion of the Court by MOON, C.J.

Defendant-appellee-petitioner John Doe [hereinafter, Alleged Father] timely petitioned this court for a writ of certiorari, which we granted, to review the opinion of the Intermediate Court of Appeals (ICA) in *Doe v. Doe*, 99 Hawai'i 24, 52 P.3d 278 (2001) (ICA Op.). Alleged Father contends that the ICA erred in holding that Hawai'i Revised Statutes (HRS) chapter 584, Hawai'i's version of the Uniform Parentage Act (1973) [hereinafter, UPA], prevents him from asserting defenses based upon res judicata and equitable estoppel in a paternity action. We agree with Alleged Father. For the reasons discussed herein, we reverse in part and affirm in part the ICA's decision.

## I. *BACKGROUND*

### A. *Family Court Proceedings*

In April 1987, plaintiff-appellant Jane Doe [hereinafter, Mother] married defendant-appellee John Doe II [hereinafter, Presumed Father]. During their marriage, Mother gave birth to a daughter (Daughter) in 1988 and to plaintiff John Doe III [hereinafter, Son] on July 7, 1992. Mother and Presumed Father were divorced pursuant to a March 22, 1994 Divorce Decree (Divorce Decree or Decree). The Divorce Decree incorporated a "Marital Settlement and Child Custody Agreement[,]" which stated that "[t]here are two children[,] the issue of this marriage[,]

---

1. A separate opinion or opinions will be filed subsequently.

who are minors and who require support to wit: [Daughter and Son]." The Decree awarded Mother physical custody of Daughter and Son and contained a detailed visitation schedule. The Decree also ordered Presumed Father to pay child support and contained detailed provisions for insurance, educational, and other support. Between August 1994 and April 1996, Mother and Presumed Father each filed numerous motions in the family court related to custody, visitation, and support disputes.

On April 22, 1996, over two years after entry of the Divorce Decree, Mother filed a "Petition for Paternity, Custody and Other Relief[,]" pursuant to HRS chapter 584, asserting that Alleged Father is Son's natural father. Mother sought, *inter alia:* (1) an order for genetic testing of Alleged Father, Mother, and Son in accordance with HRS § 584–11 (Supp.1995), discussed *infra;* (2) a judgment establishing Alleged Father as Son's natural father; (3) orders awarding visitation to Alleged Father "in accordance with the best interests of the minor child" and modifying "any conflicting orders of the [c]ourt;" and (4) orders requiring Alleged Father to pay child support. Alleged Father denied the allegations in Mother's petition and asserted defenses of res judicata and estoppel. Presumed Father also asserted the same defenses. Both defendants filed motions to dismiss the action on these grounds, which the family court initially denied without prejudice.

On July 29, 1996, Mother moved to have Son joined as a party plaintiff and for appointment of a guardian ad litem for Son, which the family court granted. In his first report to the court, the guardian ad litem opined that it would be in the best interests of Daughter and Son for genetic tests to be completed and sealed by the court, to be released "only in accordance with further recommendations made by the children's therapists in consultation with" the guardian ad litem.

 Following evidentiary proceedings that took place on November 20 and 21, 1997 and January 15, 1998, the family court issued an order on March 8, 1998, denying Mother's request for genetic testing.[2] The family court ruled that Mother was barred from pursuing the paternity issue because: (1) the issue of Son's legitimacy had already been determined by the Divorce Decree and was barred by res judicata;[3] and (2) Mother was equitably estopped from asserting a position inconsistent from the positions she had taken in numerous other motions in the custody and support proceedings wherein she asserted that Presumed Father was the father of Son. The family court also ruled that Son was in privity with Mother as to his interest in

2. We note here that Mother opposed the evidentiary proceedings on the ground that HRS § 584–11 mandated that genetic testing be performed and did not permit the family court to exercise its discretion in deciding whether to order testing. Mother raised this issue in her appeal to the ICA, which decided it in her favor. As will be discussed in Section III.B.1 *infra*, Mother is correct on this point.

3. As it has been used in recent jurisprudence, the doctrine of res judicata generally encompasses two concepts: claim preclusion and issue preclusion (or collateral estoppel). *Dorrance v. Lee*, 90 Hawai'i 143, 148, 976 P.2d 904, 909 (1999). Claim preclusion prohibits a party from relitigating a previously adjudicated cause of action. *Id.* Claim preclusion may also prohibit a party from relitigating any claim "with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) Judgments § 24(1) (1980); *see also Silver v. Queen's Hospital*, 63 Haw. 430, 437–38, 629 P.2d 1116, 1122 (1981) (plaintiff

precluded from bringing claims in state court where the plaintiff could have brought the same claims in an earlier federal suit arising from the same series of events). Issue preclusion, or collateral estoppel, on the other hand, applies to a subsequent suit between the parties or their privies on a different cause of action and prevents the parties or their privies from relitigating any issue that was actually litigated and finally decided in the earlier action. *See Dorrance*, 90 Hawai'i at 148, 976 P.2d at 909.

Courts sometimes use the term res judicata when referring to claim preclusion, *see, e.g., In re Herbert M. Dowsett Trust*, 7 Haw.App. 640, 644 & n. 2, 791 P.2d 398, 401 & n. 2 (1990), and, at other times, have used the term res judicata when applying the doctrine of issue preclusion, or collateral estoppel. *See, e.g., State by Price v. Magoon*, 75 Haw. 164, 190–91, 858 P.2d 712, 725 (1993). In this opinion, we use the term res judicata or "preclusion" when referring generally to both doctrines of issue preclusion (or collateral estoppel) and claim preclusion, and we use the specific term when appropriate.

the divorce proceeding and was, therefore, precluded from pursuing the paternity action as well. Final judgment was entered on November 25, 1998, and Mother timely appealed. Son did not cross appeal. Presumed Father filed a notice with this court stating that he did not intend to participate in defending the judgment on appeal.

### B. ICA Proceedings

On appeal, assigned to the ICA, Mother asserted several points of error, many of which need not be addressed because of our disposition of this case. In relevant part, Mother contended that: (1) in Hawai'i, a chapter 584 proceeding is the exclusive means by which paternity can be determined; (2) her paternity claim was not barred by the doctrine of claim preclusion because claim preclusion applies only when the same parties were involved in the prior proceeding, and Alleged Father was not a party to the earlier divorce proceeding; (3) issue preclusion, or collateral estoppel, did not apply because the issue of paternity was never actually litigated in the divorce proceeding; and (4) the application of equitable estoppel to her case was unfair to Son.

The ICA essentially agreed with Mother. Basically, the ICA reasoned that Hawai'i's adoption of chapter 584 preempted any defenses based upon res judicata or equitable estoppel and that, therefore, Alleged Father could not assert these defenses. In a dissenting opinion, Judge Lim concluded that *Blackshear v. Blackshear*, 52 Haw. 480, 478 P.2d 852 (1971), discussed *infra*, was dispositive and that, according to *Blackshear*, Mother was precluded from relitigating the issue of paternity because the issue had already been decided by the Divorce Decree. Alleged Father timely applied for a writ of certiorari, which this court granted on March 29, 2001.

## II. STANDARDS OF REVIEW

### A. Writ of Certiorari

In deciding whether to grant a petition for certiorari, this court reviews ICA decisions for (1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the

ICA with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictates the need for further appeal. *See* HRS § 602–59(b) (1993). The acceptance or denial of a petition by this court is discretionary. *See* HRS § 602–59(a).

### B. Questions of Law

■ Interpretation of the relevant statutes and the issue whether the defenses of res judicata and equitable estoppel can be applied in a chapter 584 paternity proceeding are questions of law. This court reviews questions of law de novo. *See Gump v. Wal–Mart Stores, Inc.*, 93 Hawai'i 417, 420, 5 P.3d 407, 410 (2000).

## III. DISCUSSION

### A. Whether HRS Chapter 584 Preempts Defenses Based upon Res Judicata and Equitable Estoppel

In *Blackshear*, the parties' August 1964 divorce decree incorporated an agreement providing for the payment by the former husband of child support for the four minor children of the marriage. *Blackshear*, 52 Haw. at 480–81, 478 P.2d at 853. Approximately three years later, in the context of litigation concerning modification of support payments, the former husband sought to introduce evidence that two of the four children were not fathered by him. *See id.* at 481, 478 P.2d at 853. The circuit court determined that the legitimacy of the children was "res judicata." *Id.* The former husband appealed, and this court held that "[a]ppellant's position as to [the children's] parentage is without merit, this issue having been finally adjudicated below." *Id.* Thus, at the time that *Blackshear* was decided in 1971, a party could be precluded from relitigating the issue of paternity based upon a prior determination of paternity in a divorce decree.

■ In 1975, the legislature adopted Hawai'i's version of the UPA. *See* 1975 Haw. Sess. L. Act 66, at 115–26 (now codified at HRS chapter 584). The ICA concluded that, because HRS § 584–6 (1993) "permits 'the child's natural mother, whether married or unmarried at the time the child was con-

ceived,' to bring a paternity action 'within three years after the child reaches the age of majority[,]' " the law established by *Blackshear* had been displaced. *See* ICA Op., 99 Hawai'i at 36, 52 P.3d at 290 (quoting HRS § 584–6). The ICA reasoned that the legislative policy underlying chapter 584 establishes that "a presumptively legitimate child of questionable parentage should know the truth of her or his parentage—both, if there is a difference, her or his natural and her or his legal parentage." ICA Op., 99 Hawai'i at 35, 52 P.3d at 289 (quoting *Doe v. Roe*, 9 Haw.App. 623, 626–27, 859 P.2d 922, 924 (1993)) (brackets omitted). The ICA further concluded that the foregoing policy "supersedes all of the equitable estoppel considerations asserted by Presumed Father and the family court." ICA Op., 99 Hawai'i at 35, 52 P.3d at 289. We disagree.

We begin by reviewing the relevant statutory provisions. HRS § 584–1 (1993) provides in relevant part:

**Parent and child relationship defined.** As used in this chapter, "parent and child relationship" includes the legal relationship existing between ... a child and father whose relationship as parent and child *is established under this chapter* ... incident to which the law confers or imposes rights, privileges, duties, and obligations.

(Underscored emphasis added.) HRS § 584–3 (1993) provides in relevant part:

**How parent and child relationship established.** The parent and child relationship between a child and:

. . . .

(2) The natural father *may* be established under this chapter[.]

(Underscored emphasis added.) Thus, chapter 584 provides a vehicle by which paternity *may* be established. By their plain language, HRS §§ 584–1 and 584–3 do *not* state that chapter 584 is the exclusive means by which paternity must be established. Accordingly, chapter 584 is not the exclusive means by which a determination of paternity can be made. Other states that have adopted the UPA have expressly reached similar conclusions. *See, e.g., Division of Child Support Enforcement ex. rel. Blake v.*

*Myrks,* 606 A.2d 748, 751 (Del.1992) (concluding that "the [Delaware Parentage Act] is not the exclusive means of establishing paternity"); *In re Paternity of JRW and KB,* 814 P.2d 1256, 1261 (Wyo.1991) (rejecting the appellant's contention that the Wyoming Parentage Act "invalidate[s] any other paternity determination not made in strict compliance with the Act"); *State ex rel. Daniels v. Daniels,* 817 P.2d 632, 635 (Colo.Ct.App.1991) (holding that "the UPA does not mandate the exclusion of the doctrine of res judicata." (Emphasis omitted.)).

The ICA determined that, because HRS § 584–6 permits a mother to bring a paternity action any time before the child reaches age twenty-one, a defendant cannot assert a defense based upon preclusion. HRS § 584–6 provides in relevant part:

(a) A child, or guardian ad litem of the child, *the child's natural mother,* whether married or unmarried at the time the child was conceived, or her personal representative or parent if the mother has died; or a man alleged or alleging himself to be the natural father, or his personal representative or parent if the father has died; or a presumed father as defined in section 584–4, or his personal representative or parent if the presumed father has died; or the child support enforcement agency, *may bring an action for the purpose of declaring the existence or nonexistence of the father and child relationship* within the following time periods:

. . . .

(2) If the child has not become the subject of an adoption proceeding, *within three years after the child reaches the age of majority* . . . .

(Emphases added). This provision merely creates a statutory claim for relief in accordance with the rights, obligations, and procedures outlined in chapter 584. Nothing in the statute displaces common law doctrines of preclusion and estoppel any more than any other claim for relief established by other statutes. Accordingly, we disagree that HRS § 584–6 permits relitigation of the issue of paternity where it has already been determined in a prior proceeding.

Our conclusion that an individual can be precluded or estopped from relitigating the issue of paternity on the basis of a previous judgment is consistent with the case law in nearly every other jurisdiction that has adopted the UPA. *See State ex. rel. Henderson v. Tolver,* 639 So.2d 1371, 1373 (Ala.Civ.App.1994) (mother precluded from asserting that an individual other than her former husband was the father of two children where the prior divorce decree referred to the children as "born of the marriage"); *In re Marriage of Hotz,* 168 Cal.App.3d 605, 214 Cal.Rptr. 658, 659 (1985) (former husband precluded from denying paternity in a post-divorce support proceeding where the divorce decree declared that the child was the issue of the marriage); *Daniels,* 817 P.2d at 633–35 (former husband precluded from denying paternity in a post-divorce support proceeding where the earlier divorce decree declared that the children were the result of the marriage); *Myrks,* 606 A.2d at 749–50 (individual who stipulated to paternity in an earlier support proceeding barred from subsequently attempting to disestablish paternity under Delaware Parentage Act procedures); *In re Marriage of Klebs,* 196 Ill. App.3d 472, 143 Ill.Dec. 363, 554 N.E.2d 298, 300–303 (1990) (mother collaterally estopped from reopening divorce decree which identified child as "born to the marriage" where mother's motive was solely to bring about paternity petition to disestablish paternity in former husband); *In re Marriage of Ross,* 13 Kan.App.2d 402, 772 P.2d 278, 283 (1989) (mother who claimed former husband was the father of a child in an earlier divorce proceeding was equitably estopped from subsequently pursuing a paternity petition against a different individual), *affirmed in part and reversed in part on other grounds,* 245 Kan. 591, 783 P.2d 331 (1990); *Markert v. Behm,* 394 N.W.2d 239, 241–42 (Minn.Ct. App.1986) (mother equitably and collaterally estopped from pursuing paternity action against a different man where she had previously testified that her former husband was

the father of their child and the earlier divorce decree identified her former husband as the father); *Gipson v. Enright,* 753 S.W.2d 122, 123 (Mo.Ct.App.1988) (mother collaterally estopped from relitigating the issue of paternity where prior a divorce decree adjudicated the child to be born of mother and her former husband); *In re Marriage of Holland,* 224 Mont. 414, 730 P.2d 410, 411 (1986) (former husband collaterally estopped from disestablishing paternity where divorce decree declared the child to be "of the marriage"); *Love v. Love,* 114 Nev. 572, 959 P.2d 523, 526 (1998) (stating "it is generally accepted that decisions as to the paternity of a child, litigated pursuant to a divorce decree, are res judicata as to subsequent proceedings between the parties");[4] *N.M. v. J.G.,* 255 N.J.Super. 423, 605 A.2d 709, 712 (Ct.App. Div.1992) (mother equitably estopped from pursuing paternity action against a different man where she had previously submitted sworn testimony that her former husband was the father of the child); *Callison v. Naylor,* 108 N.M. 674, 777 P.2d 913, 916 (N.M.Ct.App.1989) (former husband collaterally estopped from disestablishing paternity after the divorce decree determined the offspring to be a child of the marriage); *In re M.Z.,* 472 N.W.2d 222, 223 (N.D.1991) (appellant precluded from disestablishing paternity where previous stipulation to paternity was incorporated into support judgment); *In re Gilbraith,* 32 Ohio St.3d 127, 512 N.E.2d 956, 959 (1987) (former husband precluded from disestablishing paternity in post-divorce support proceeding); *Pettinato v. Pettinato,* 582 A.2d 909, 912–13 (R.I.1990) (mother equitably estopped from disestablishing paternity during a divorce proceeding where mother's earlier conduct evinced an acceptance of husband as the child's father); *In re Paternity of JRW and KB,* 814 P.2d 1256, 1264–65 (Wyo.1991) (former husband precluded from disestablishing paternity where the earlier divorce decree identified the children as issue of the marriage).[5]

**4.** The court in *Love* held that the appellant could proceed with an action in the trial court to vacate the divorce decree with the goal of disestablishing paternity because the appellant had alleged "extrinsic fraud" in the earlier divorce proceeding. *See Love,* 959 P.2d at 526.

**5.** Eighteen jurisdictions, including Hawai'i, have substantially adopted the UPA. *See* UPA Table of Authorities, 9B U.L.A. 377 (2001). Of these, the only jurisdiction that has permitted relitigation of the issue is Washington, and that was in a case with unusual factual circumstances. In *McDan-*

Moreover, contrary to the ICA's conclusion, HRS § 584–6(c) does not permit Mother to relitigate the issue of paternity. HRS § 584–6(c) states:

Regardless of its terms, *an agreement,* other than an agreement approved by the court in accordance with section 584–13(b) [relating to pretrial settlements in paternity actions under this chapter], between the alleged or presumed father and the mother or child, shall not bar an action under this section.

(Emphasis added.) The ICA determined that the Divorce Decree between Mother and Presumed Father was an "agreement" that cannot bar Mother from pursuing an action under HRS § 584–6(a). ICA Op., 99 Hawai'i at 35–36, 52 P.3d at 289–290. However, the Divorce Decree is not a mere "agreement;" the Decree constitutes a *final judgment* of the family court. *Cf. Brooks v. Minn,* 73 Haw. 566, 571–72, 836 P.2d 1081, 1084–85 (1992) (agreement in a divorce proceeding concerning payment of a promissory note was merged into the judgment and became enforceable as a judgment rather than as a contract). HRS § 580–5 (1993) states:

Upon the hearing of every complaint for annulment, divorce, or separation, the court shall require exact legal proof upon every point, notwithstanding the consent of the parties. Where the matter is uncontested and the court, in its discretion, waives the need for a hearing, then the court shall require exact legal proof upon every point by affidavit.

Thus, the Divorce Decree has the same binding effect as any other court judgment. *See Gilbraith,* 512 N.E.2d at 959–60 (specifically rejecting the contention that the analogous provision in the Ohio Parentage Act barred consideration of paternity determined in a divorce judgment arising from a stipulation). We adopt the reasoning of the court in *Gil-*

*braith* regarding Ohio's statutory provision analogous to HRS § 584–6(c) and state:

[W]e are convinced that [HRS § 584–6(c) ] is, in general, limited by its terms to those agreements ordinarily made outside the judicial process, and that it is not intended to apply when there is a final judicial resolution of rights and obligations on the basis of an underlying agreement between the parties to an action. This is just as true for a legitimation order as it is for a dissolution decree, both of which manifestly involve, by virtue of their roles in the judicial process, something more than an "agreement" as that term is used in [HRS § 584–6(c) ].

*Id.* at 960 (footnote omitted). Consequently, a final Divorce Decree is not an "agreement" within the meaning of HRS § 584–6(c), and the statute does not permit Mother to escape the preclusive effect of the Divorce Decree.

Our conclusion that an individual can be precluded or estopped from asserting paternity on the basis of a previous judgment is also consistent with the purposes of chapter 584. We respectfully disagree with the ICA that the policy enunciated by chapter 584 is to permit a "presumptively legitimate child of questionable parentage" to "know the truth of her [or his] parentage[.]" ICA Op. at 21. The fundamental purposes of chapter 584 are "to provide substantive legal equality for all children regardless of the marital status of their parents" and to protect the rights and ensure the obligations of parents of children born out of wedlock. *See* Stand. Comm. Rep. No. 190, in 1975 House Journal, at 1019. The legislature enacted the UPA because the UPA was

designed to meet the constitutional equality standards enunciated by the United States Supreme Court in two lines of decisions, one beginning with *Levy v. Louisiana,* 391 U.S. 68 [88 S.Ct. 1509, 20 L.Ed.2d 436] (1968), dealing with the substantive rights of the child born out of wedlock;

*iels v. Carlson,* 108 Wash.2d 299, 738 P.2d 254, 256–60 (1987), the court held that a petitioner could pursue an action to establish paternity because the child's mother had alternately cohabited with the petitioner and the former husband of the mother, despite the fact that the divorce decree identified the child as "issue" of

the marriage. The court held that the elements of equitable and collateral estoppel had not been established. The child viewed both the petitioner and the former husband as father figures and had established a workable relationship with each.

and the other beginning with *Stanley v. Illinois,* 405 U.S. 645 [92 S.Ct. 1208, 31 L.Ed.2d 551] (1972), dealing with the rights of the father of a child born out of wedlock.

Stand Comm. Rep. No. 190, in 1975 House Journal, at 1019. The substantive legal rights that illegitimate children were denied in many states included such rights as the right to intestate succession, the right to benefit from a statutory cause of action typically accorded to legitimate children, and the right to be the beneficiary of child support from the father. *See generally Gomez v. Perez,* 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973); UPA Prefatory Note, 9B U.L.A. at 378–79. For purposes of this discussion, the UPA and, by extension, chapter 584 are largely concerned with establishing a means by which to identify the person (usually the father) against whom these rights may be asserted. *See* UPA Prefatory Note, 9B U.L.A. at 379. In short, it is to ensure that every child, to the extent possible, has an identifiable legal father. Although this goal will usually overlap with the desire of a child to know the identity of his or her biological father, the two are not always the same. Precluding Mother from attempting to relitigate the issue of paternity and disestablish paternity in Presumed Father is consistent with the goal of chapter 584 to ensure that every child has a legal father.

■ We emphasize the foregoing policy discussion in part to correct a misstatement made by the ICA regarding the manner in which the legal presumptions established by chapter 584 are to be applied in paternity proceedings. HRS § 584–4 (Supp.1995) established several legal presumptions that are to be employed in a paternity action. One of these is that a man is presumed to be the father of a child if the child is born to the man's wife during the time the couple is married. *See* HRS § 584–4(a)(1). Another is that a man is presumed to be the father of a child if appropriate genetic testing suggests that he is the child's biological father. *See* HRS § 584–4(a)(5). In determining legal paternity, HRS § 584–4(b) instructs that:

A presumption under this section may be rebutted in an appropriate action only

by clear and convincing evidence. If two or more presumptions arise which conflict with each other, the presumption which *on the facts* is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing paternity of the child by another man.

(Emphasis added.) Thus, the statute mandates that, when conflicting presumptions are present, the family court consider the individual facts of each case in light of "policy and logic" to determine paternity. In contrast, relying upon its belief that the purpose of chapter 584 was to ensure that every child be able to determine the identify of his or her biological father, the ICA appears to conclude that the presumption based on genetic testing controls as a matter of law:

[W]e conclude that as compared to the presumption based on HRS §§ 584–4(a)(1) (presumption of paternity based on marital status), the presumption based on HRS § 584–4(a)(5) (presumption of paternity based on genetic testing) is "the presumption which on the facts is founded on the weightier considerations of policy and logic" and, therefore, it "controls." HRS § 584–4(b).

ICA Op., 99 Hawai'i at 35, 52 P.3d at 289. We disagree. If the genetic testing presumption "controlled" as a matter of law, then HRS § 584–4 would plainly say so, and there would be no point in directing the court to consider which competing presumption "on the facts is founded on the weightier considerations of policy and logic[.]" Thus, the genetic testing presumption is not more important than the other presumptions; it is one of several that must be considered in light of the fundamental purpose of chapter 584.

Moreover, we note that construing HRS § 584–6 as the ICA did would be contrary to the purposes of chapter 584 in many instances. According to the ICA's interpretation, a presumed father of a child, whose paternity had been established in a prior judicial proceeding, could initiate an action to *disestablish* paternity any time, so long as the child had not yet turned twenty-one. *See* HRS § 584–6(a), *supra* 99 Hawai'i at 5, 52 P.3d at

259 (stating that "a presumed father" "may bring an action for the purpose of declaring the existence or nonexistence of the father and child relationship"). Because such an action could be brought even in the absence of another identifiable father, the result would be to leave a child with no identifiable legal father—particularly if the genetic testing presumption of HRS § 584–4(a)(5) "controlled." The legislature most certainly did not intend such a result in adopting the UPA as codified in chapter 584.

Furthermore, we note that the National Conference of Commissioners on Uniform State Laws recently promulgated the Uniform Parentage Act (2000) [hereinafter, UPA (2000)]. Although the provisions of UPA (2000) are not determinative of how this court should interpret chapter 584, the provisions of UPA (2000) relating to the binding effect of a prior adjudication of parentage and the rationale for making these revisions are nonetheless helpful.[6] Section 637 of UPA (2000) states in relevant part:

(c) In a proceeding to dissolve a marriage, the court is deemed to have made an adjudication of the parentage of a child if the court acts under circumstances that satisfy the jurisdictional requirements of [Section 201 of the Uniform Interstate Family Support Act, dealing with long-arm jurisdiction over nonresidents], and the final order:

(1) *expressly identifies a child as a "child of the marriage," "issue of the marriage," or similar words indicating that the husband is the father of the child;* or

(2) provides for support of the child by the husband unless paternity is specifically disclaimed in the order.

(d) Except as otherwise provided in subsection (b) [relating to the binding effect of a prior adjudication on the child, *see* discussion *infra* ], *a determination of parentage may be a defense in a subsequent proceeding seeking to adjudicate parentage by an individual who was not a party to the earlier proceeding.*

(Emphases added.) The comment to UPA (2000) section 637 states in relevant part:

A considerable amount of litigation involves exactly who is bound and who is not bound by a final order determining parentage. . . . .

. . . .

Subsection (c) resolves whether a divorce decree constitutes a finding of paternity. *This subsection provides that a decree is a determination of paternity if the decree states that the child was born of the marriage or grants the husband visitation or custody, or orders support. This is the majority rule in American jurisprudence.*

*Subsection (d) gives protection to third parties who may claim benefit of an earlier determination of parentage.*

(Emphasis added.) These provisions of UPA (2000) are helpful because, assuming *arguendo* that there was any ambiguity regarding the question whether an individual can be bound by a previous determination of parentage made outside the parameters of chapter 584, UPA (2000) represents the present consensus of how the issue should be resolved on policy grounds, a view that we share. *See, e.g., Gilbraith*, 512 N.E.2d at 961 (declaring that "[t]he establishment and maintenance of the various aspects of the relationship between parent and child is a particularly intricate, sensitive and emotional process with which courts should be reluctant to interfere" and that, as a general rule, "relitigation of parentage [should] be barred"); *Myrks*, 606 A.2d at 751 (noting that, if the court were to allow relitigation of paternity issues under the Delaware Parentage Act, "all findings of paternity made in conjunction with child support proceedings would be nonbinding and subject to attack at a later time"); *In re JRW and KB*, 814 P.2d at 1265 ("Because of the potentially damaging effect that relitigation of a paternity determination might have on innocent children, the doctrines of res judicata and collateral estoppel are rigorously observed in the paternity context.").

Additionally, the existence of HRS § 571–47 (1993) does not change the above analysis, as Mother contends. HRS § 571–47 states:

---

6. The UPA does not expressly address these issues.

> Whenever, in any action involving the custody or support of a child apparently born in lawful wedlock, the legitimacy of the child is placed in issue, the court may make the child a party to the action, if not already a party, and shall thereupon determine the legitimacy of the child as one of the issues in the action. The court shall appoint a guardian ad litem to represent the interests of the child and may assess the reasonable fees and expenses of the guardian ad litem as costs of the action, payable in whole or in part by any or all parties as the circumstances may justify. In the event the child is not made a party to the action, a determination that the child was not born to parents married to each other at the time of the child's birth shall not be binding upon the child.

Presumably focusing on language stating that the family court "shall thereupon determine the legitimacy of the child as one of the issues in the action," Mother submits that HRS § 571–47 *requires* the family court to determine paternity whenever so requested by a party, as long as the request is made in the context of a custody or support proceeding. We disagree.

HRS § 571–47 is a general jurisdictional statute that was enacted in 1967, before this court's decision in *Blackshear* and before the legislature's enactment of HRS chapter 584. *See* 1967 Haw. Sess. L. Act 56, § 5, at 63. It was inserted into a provision of the statutes dealing generally with procedures in juvenile courts, *see generally* Rev. Laws Haw. (RLH) chapter 333 (1955), and remains in an analogous section of the HRS today. *See generally* HRS chapter 571, part V (describing procedures in family courts). The provision was one of several designed to enhance the powers of the juvenile courts and was enacted to "set[ ] forth certain statutory criteria for handling the issue of legitimacy raised in a custody or support action" because there was no statute on the "subject" at the time. Stand. Comm. Rep. No. 611, in 1967 Senate Journal, at 1127. Considering its history and reading the statute as a whole, we believe the statute is designed to ensure, by appointment of a guardian ad litem, that a child is represented in a support proceeding when the issue of the child's legitimacy or parentage is raised.

However, the issue of parentage itself must be properly before the court in the first instance, and the issue cannot properly be before the court if the party asserting the issue is precluded or estopped from raising it. The statute focuses on proper representation for the child and says nothing about displacing common law doctrines of res judicata or equitable estoppel.

Moreover, the court in *Blackshear* was presumably aware of this provision when it decided that the issue of the parentage of a child born in wedlock could not be relitigated in a subsequent support proceeding. We do not believe that HRS § 571–47, enacted nine years before chapter 584 as part of a general measure to improve the functioning of the juvenile courts, was intended to allow the use of the paternity proceedings in chapter 584 to displace common law doctrines of preclusion or estoppel.

Based on all of the foregoing, we hold that: (1) the enactment of chapter 584 does not displace this court's previous decision in *Blackshear*; (2) does not prevent a proper litigant in a paternity action from asserting defenses based upon res judicata and equitable estoppel; and (3) a final judgment—including a divorce decree—can serve as the basis for such defenses.

### B. Application to this Case

Here, the family court determined that the issue of Son's parentage was "res judicata" and that Mother was equitably estopped from proceeding with a paternity action. We now turn to one aspect of res judicata—issue preclusion.

Issue preclusion, or collateral estoppel, bars relitigation of an issue where: (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior adjudication. *Dorrance*, 90 Hawai'i at 149, 976 P.2d at 910. Issue preclusion can be raised defensively by one who was not a party in the prior adjudi-

cation. *See Ellis v. Crockett,* 51 Haw. 45, 55–57, 451 P.2d 814, 822, *reh'g denied,* 51 Haw. 86, 451 P.2d 814 (1969).

■ In this case, all of the foregoing requirements have been met with respect to Mother. The prior adjudication was the divorce proceeding between Mother and Presumed Father. The identical issue of who is Son's father was determined by the Divorce Decree when it declared that "[t]here are two children the issue of this marriage who are minors and who require support[,]" expressly naming Daughter and Son. The Divorce Decree constituted a final judgment. The issue of paternity was essential to the portion of the final judgment that ordered Presumed Father to make support payments and that provided for custody and visitation. Finally, the defense is being asserted against Mother, who was a party to the divorce proceeding. Similar circumstances were present in *Blackshear,* the difference being that the defense was asserted against the former husband rather than the former wife. Accordingly, we hold that Mother is barred by the doctrine of issue preclusion, or collateral estoppel, from bringing an action against Alleged Father to establish paternity pursuant to HRS § 584–6. In light of this determination, we need not address whether the doctrines of claim preclusion or equitable estoppel bar Mother's petition.

## C. *Other Issues*

### 1. The "Best Interest of the Child" and Genetic Testing

■ Although not strictly necessary to the disposition of this case, we address the following issue in order to make clear that the ICA correctly applied *Child Support Enforcement Agency v. Doe,* 88 Hawai'i 159, 963 P.2d 1135 (App.1998) [hereinafter, *CSEA*], and that *CSEA* continues to be "good law" notwithstanding this opinion. The family court, before deciding whether to order genetic testing in this case, conducted evidentiary proceedings in order to determine if such testing would be in Son's "best interests." *See supra* note 2. HRS § 584–11(a) (Supp.1995) stated in relevant part that "[t]he court may, *and upon request of a party, shall,* require the child, mother, or

alleged father to submit to genetic tests, including blood tests." (Emphasis added.) In *CSEA,* the ICA held that the language of HRS § 584–11(a) was mandatory and did not permit the family court to consider whether such testing was in the best interests of the child before ordering testing. *See CSEA,* 88 Hawai'i at 174, 963 P.2d at 1150. Nonetheless, the family court in this case ruled that language in HRS § 584–13(c), conditioning an order for testing on whether such testing was "practicable," permitted the family court to refuse to order the testing if it was not in the best interest of Son. This latter ruling by the family court was error.

■ HRS § 584–13 addresses pre-trial settlement issues and provides in relevant part:

(a) On the basis of the information produced at [a mandated] pre-trial hearing, the judge conducting the hearing shall evaluate the probability of determining the existence or nonexistence of the father and child relationship in a trial and whether a judicial declaration of the relationship would be in the best interest of the child. On the basis of the evaluation, an appropriate *recommendation for settlement* shall be made to the parties, which may include any of the following:

(1) That the action be dismissed with or without prejudice;

(2) That the matter be compromised by an agreement among the alleged father, the mother, and the child, in which the father and child relationship is not determined but in which a defined economic obligation is undertaken by the alleged father in favor of the child and, if appropriate, in favor of the mother, subject to approval by the judge conducting the hearing. In reviewing the obligation undertaken by the alleged father in a compromise agreement, the judge conducting the hearing shall consider the best interest of the child, in the light of the factors enumerated in section 576D–7, discounted by the improbability, as it appears to him, of establishing the alleged father's paternity or nonpater-

nity of the child in a trial of the action. In the best interest of the child, the court may order that the alleged father's identity be kept confidential. In that case, the court may designate a person or agency to receive from the alleged father and disburse on behalf of the child all amounts paid by the alleged father in fulfillment of obligations imposed on him; or

(3) That the alleged father voluntarily acknowledge his paternity of the child.

(b) If the parties accept a recommendation made in accordance with subsection (a), judgment shall be entered accordingly.

(c) *If a party refuses to accept a recommendation made under subsection (a) and genetic tests, including blood tests have not been taken, the court shall require the parties to submit to genetic tests, if practicable.* Thereafter the judge shall make an appropriate final recommendation. If a party refuses to accept the final recommendation, the action shall be set for trial.

(Emphases added.) The purpose of HRS § 584–13 is to encourage settlement and to give the family court a broad range of options in pursuing this goal. However, the language of subsection (c), consistent with HRS § 584–11, *mandates* that genetic testing be performed (where it has been requested by a party) if the parties cannot reach a settlement. The commentary to the analogous UPA section demonstrates that the mandatory testing requirement in subsection (c) was designed to *further* the goal of settlement:

The settlement procedures contemplated by this Section are voluntary. If any party refuses to accept a settlement recommendation, the action will be set for trial. *It is expected, however, that, as soon as reliable blood test evidence becomes available on a large scale, the great majority of cases will be settled consensually in the light of such evidence.*

(Emphasis added.) Consequently, we agree with the ICA that the language conditioning genetic testing on such testing being "practicable" refers only to the practical aspects of completing the testing and does not permit the family court to consider the "best interest of the child" in deciding whether to order testing in the first place. *See* ICA Op., 99 Hawai'i at 34, 52 P.3d at 288.[7] Accordingly, the family court erred in concluding that it was permitted to consider whether genetic testing was in Son's best interest before ordering the testing. The family court's error was harmless, however, because the family court correctly ruled that Mother was precluded from bringing the action in the first place. The proper course of action should have been to dismiss Mother's complaint before even considering testimony concerning Son's best interest.

## 2. Son's Interest

■ Finally, we wish to emphasize that our decision deals exclusively with *Mother's* ability to pursue a chapter 584 paternity action. It does not address the propriety of the family court's decision that *Son* was precluded from bringing this action on the ground that he was in privity with Mother during the divorce proceeding. Son did not cross-appeal the family court's judgment. It is well-settled that "an appellee is ordinarily not entitled to attack a judgment without a

7. This interpretation is consistent with the underlying purposes of the UPA and chapter 584. HRS § 584–13 encourages settlement of disputed paternity issues that take into account the best interest of the child, even absent genetic test results. If the case cannot be settled and genetic testing has not been performed, the statute *mandates* genetic testing (upon request of a party) as a further means of encouraging settlement. If the case still does not settle and the evidence at trial presents conflicting presumptions of paternity, the trial judge is to choose the presumption "which on the facts is founded on the weightier considerations of policy and logic[.]" HRS § 584–4(c). These latter considerations involve not only the best interests of the child but *also* the rights and obligations of parents. *See supra* at 16 (identifying the two fundamental purposes of chapter 584 and the UPA as equalizing the legal treatment of children born out of wedlock and protecting the rights of natural fathers).

We note that, notwithstanding its final paternity decision, HRS § 584–15(c) (Supp.2001) permits the court to issue orders to any appropriate party addressing "any other matter in the best interest of the child" and that the family court retains continuing jurisdiction to enforce or modify these orders. *See* HRS §§ 584–17 (1993) and 584–18 (Supp.2001).

cross appeal." *Arthur v. Sorensen,* 80 Hawai'i 159, 167, 907 P.2d 745, 753 (1995) (citing *Shoemaker v. Takai,* 57 Haw. 599, 607, 561 P.2d 1286, 1291 (1977)). The ICA properly did not address Son's status, and we have no occasion to do so here.

## IV. CONCLUSION

Based on the foregoing, we hold that the enactment of chapter 584 does not displace this court's previous decision in *Blackshear,* does not prevent a proper litigant in a paternity action from asserting defenses based upon res judicata and equitable estoppel, and a final judgment—including a divorce decree—can serve as the basis for such defenses. We further hold that Mother is barred by the doctrine of issue preclusion, or collateral estoppel, from bringing an action against Alleged Father to establish paternity pursuant to HRS § 584–6. Finally, we reiterate that *Child Support Enforcement Agency v. Doe,* 88 Hawai'i 159, 963 P.2d 1135 (App. 1998) (holding that HRS § 584–11 mandates genetic testing if the proper statutory requirements have been satisfied), is valid law and hold that the term "practicable" in HRS § 584–13(c) does not permit the family court to consider the "best interest of the child" in deciding whether to order genetic testing. Accordingly, we reverse the ICA's decision, except that we affirm its analysis as to *CSEA* and the interpretation of the term "practicable" in HRS § 584–13(c). Consequently, we affirm the family court's November 25, 1998 final judgment.

Dissenting Opinion by RAMIL, J., with whom ACOBA, J., Joins.

Recently, this court has had reason to consider the purpose of judicial publication. Publication is critical to the development of law. I am concerned that this court periodically abdicates its role in guiding the public on important legal issues by misusing its power to issue summary disposition orders. My concern first arose when this court sur-

prisingly disposed of *Baehr v. Miike,* 92 Hawai'i 634, 994 P.2d 566 (1999), by a summary disposition order, and my concern has not dissipated with the increased frequency of such occurrences.[1] Ironically, my views on when publication is necessary have thus far only appeared in opinion that is un-published. *See id.* I therefore take the opportunity in this published opinion to present my recommendation that this court adopt Rule 36(b)(2) of the United States Court of Appeals of the First Circuit.

I begin by explaining when summary disposition orders may properly be used. The guidelines for disposition of cases are set forth by the report of the Hawai'i Chapter of the American Judicature Society's Special Committee on Unpublished Judicial Opinions:

(1) Summary disposition orders are issued when the appellate courts are affirming a judgment and the issues raised are decided by application of well-known legal principles to unremarkable facts.

(2) Memorandum opinions are issued when the appellate courts are reversing a judgment or when they are affirming, affirming in part and vacating in part, or affirming in part and reversing in part, but are applying well-known legal principles to unremarkable facts.

(3) Published opinions are issued when explication of the law will provide some benefit to parties, courts, and practitioners. Published opinions are more likely when the case involves unique issues of law, cases of first impression, the application of known legal principles in circumstances different from previous cases, or when known legal principles need further explanation or limitation.

Furthermore, the ABA Standards for Appellate Courts § 3.36 instruct, "A full written opinion reciting the facts, the questions presented, and analysis of pertinent authorities

---

1. A summary disposition order is generally understood to be a one-line affirmance, in effect adopting the reasoning of the trial court. It should also be generally understood that the decision must be a unanimous one. In cases where unanimity cannot be reached, it should not be disposed of via summary disposition order. In *Baehr,* the majority filed a four-page summary disposition order, with a five-page concurrence attached. It is problematical that despite nine pages of discussion, the case was still disposed of via summary disposition order.

and principles, should be rendered in cases involving new or unsettled questions of general importance." *See also* Commentary to ABA Standards for Appellate Courts § 3.36 ("[Unpublished] opinions should not be used to avoid responsibility for reasoned, legally supported resolution of difficult cases.").

It logically follows, then, that the guidelines envisioned that the accompaniment of a dissenting or concurring opinion necessarily designates the disposition for publication, unless the court unanimously finds reason not to publish. The current practice of the court disregards the existence of dissenting or concurring opinions in deciding whether or not to publish, so long as the majority is satisfied that publication is not warranted. I ask whether there is a clearer indication of an "unsettled question" than the Supreme Court itself being divided on an issue. If the case involves, as the above criteria suggests, "the application of well-known legal principles" such that publication will not "provide some benefit," then the correct result and the correct basis for the result should be obvious to any individual well-trained in the law. Thus, in the absence of a unanimous agreement otherwise, the existence of disagreement

among Supreme Court justices removes the case from summary disposition order eligibility.

I caution that improper use of a summary disposition order has the deleterious effect of stifling the development of law. At the present time, our rules of appellate procedure forbid citation to summary disposition orders in all but a few limited situations. *See* Hawai‘i Rules of Appellate Procedure (HRAP), Rule 35(c).[2] Furthermore, summary disposition orders are not available in the Hawai‘i Reports, the Pacific Reporter, Westlaw, or Lexis; they are only available on the Judiciary website, and can be accessed only by date. *See, e.g., AIG Hawai‘i Ins. Co., Inc. v. Yucoco,* 91 Hawai‘i 123, 980 P.2d 997 (1998) (memorandum opinion).[3] Thus, when an opinion is not published, a justice is impeded in presenting his or her perspective of the law to interested parties.[4] Prudence then dictates that in situations where there is disagreement as to the precedential value of a case, publication must be allowed. In short, we must be careful to never silence a justice through the use of a summary disposition order.[5]

**2.** In its April 24, 2002 report, the Hawai‘i Chapter of the American Judicature Society's Special Committee on Unpublished Judicial Opinions recommended that HRAP Rule 35 should be amended to allow a party to cite a memorandum opinion or unpublished dispositional order in any action or proceeding, provided it has persuasive value. Until HRAP Rule 35 is amended, the inability to cite to unpublished judicial opinions remains a danger of tiered publication. As discussed *infra,* however, this danger may also be obviated by other measures.

**3.** I attempted to retrieve the *Yucoco* decision from the Judiciary website by selecting the month and year of disposition, and then scrolling down the days until I found the decision. When I clicked on the memorandum opinion, however, I found that it was inexplicably unavailable. It appears that in order to obtain a copy of *Yucoco,* one would need to submit a request to the Supreme Court Clerk's Office. The Clerk's Office will then provide it at a charge of $1.00 for the first page, and $0.50 for each additional page.

**4.** There should be no question that separate opinions are more than simply the losing side of a vote. Publication of dissenting and concurring opinions assures the public that its court of last resort is not acting as a Star-chamber, assists future courts in revisiting issues where error may have been made or the times require further

consideration, provides the legal community with a more thorough understanding of the different viewpoints espoused by the justices of the court, and oftentimes provides a basis for legislative response. The majority's current practice demonstrates its belief that a minority of the court is incapable of correctly determining that an opinion has precedential value. The danger of such practice is that the majority that makes the substantive decision always has the power to decide if the dissent will be permitted to express its disagreement with the majority.

**5.** In his dissenting opinion in *Poe v. Hawai‘i Labor Relations Board,* 98 Hawai‘i 416, 49 P.3d 382 (2002), Justice Acoba provides an example of how a rule that restricts publication can result in abusive practices:

> Judge Jefferson's experience in a California Court of Appeals case, *People v. Para,* No. CRA 15889 (Cal.Ct.App. Aug. 1979), is instructive: Initially, it appeared that the majority felt the same as I do regarding the fact that the majority opinion merited publication in the Official Reports. When circulated to me, the majority opinion was approved of by the two justices making up the majority and was marked for publication in the Official Reports. It was only after I had circulated my dissenting opinion to the two justices who

Although this court has not before found reason to incorporate publication procedures into the Hawai'i Rules of Appellate Procedure, I believe that recent events necessitate such action. Accordingly, I recommend that this court adopt Rule ·36(b)(2) of the United States Court of Appeals for the First Circuit, which provides:

(2) Manner of Implementation.

(A) As members of a panel prepare for argument, they shall give thought to the appropriate mode of disposition (order, memorandum and order, unpublished opinion, published opinion). At conference the mode of disposition shall be discussed and, if feasible, agreed upon. Any agreement reached may be altered in light of further research and reflection.

(B) With respect to cases decided by a unanimous panel with a single opinion, if the writer recommends that the opinion not be published, the writer shall so state in a cover letter or memorandum accompanying the draft. After an exchange of views, should any judge remain of the view that the opinion should be published, it must be.

(C) *When a panel decides a case with a dissent, or with more than one opinion, the opinion or opinions shall be published unless all participating judges decide against publication.* In any case decided

by the court en banc the opinion or opinions shall be published.

(D) Any party or other interested person may apply for good cause shown to the court for publication of an unpublished opinion.

(E) If a District Court opinion in a case has been published, the order of court upon review shall be published even when the court does not publish an opinion.

(F) Unpublished opinions may be cited in filings with or arguments to this court only in related cases. Otherwise only published opinions may be cited. A published opinion is one that appears in the ordinary West Federal Reporter series (not including West's Federal Appendix) or as a recent opinion intended to be so published. All slip opinions released by the clerk's office are intended to be so published unless they bear the legend "Not For Publication" or some comparable phraseology.

(G) Periodically the court shall conduct a review in an effort to improve its publication policy and implementation.

(Emphasis added.) [6]

Dissenting Opinion of ACOBA, J., with whom RAMIL, J., joins.

I respectfully disagree with the majority's position, inasmuch as·(1) the question of the

---

make up the majority that they decided to reverse their original position regarding publication in the Official Reports. I do not think this reversal of position is justified. *Poe,* 98 Hawai'i at 420 n. 1, 49 P.3d 382 (citation omitted).

6. Several federal and state jurisdictions incorporate a rule similar to the First Circuit's Rule 36(b)(2)(C) into their appellate procedures. *See, e.g.,* U.S.Ct. of App. 5th Cir., Rule 47.5.1 ("An opinion may also be published if it: *Is accompanied by a concurring or dissenting opinion ...."* (emphasis added)); U.S.Ct. of App. 6th Cir., Rule 206 ("The following criteria shall be considered by panels in determining whether a decision will be designated for publication in the Federal Reporter: ... (4) *whether it is accompanied by a concurring or dissenting opinion ....* An opinion or order shall be designated for publication *upon the request of any member of the panel."* (emphases added)); U.S.Ct. of App. 8th Cir., App. I ("The Court or a panel will determine which of its opinions are to be published, except that *a judge may make any of his opinions available for publication."* (emphasis added)); U.S.Ct. of App.

9th Cir., Rule 36–2 ("A written, reasoned disposition shall be designated as an OPINION only if it: ... *Is accompanied by a separate concurring or dissenting expression, and the author of such separate expression requests publication of the disposition of the Court and the separate expression."* (capitalization in original; emphasis added)); Alabama Rules of Appellate Procedure, Rule 53 (*"[I]f in a "No Opinion" case a Justice or Judge writes a special opinion, either concurring with or dissenting from the action of the court, the reporter of decisions shall publish that special opinion,* along with a statement indicating the action to which the special opinion is addressed." (emphasis added)); Rules of the Supreme Court of Arizona, Rule 111(b)(4) ("Dispositions of matters before the court requiring a written decision shall be by written opinion when a majority of the judges acting determine that it involves a legal or factual issue of unique interest or substantial public importance, or *if the disposition of matter is accompanied by a separate concurring or dissenting expression, and the author of such separate expression desires that it be published, then the decision shall be by*

**16**

paternity of Plaintiff John Doe III(Son) was never actually litigated in the prior divorce proceeding so as to give *res judicata* or binding effect, under the doctrine of collateral estoppel or issue preclusion, to the divorce decree's statement that Son was the child of Respondent/ Defendant Appellee John Doe II (Presumed Father) in all subsequent proceedings and (2) the advent and, in this case, availability of DNA testing[1] to determine paternity outweighs all other statutory prescriptions contained in Hawai'i Revised Statutes (HRS) § 584–4 (Supp.2001), which were adopted in aid of establishing paternity.

### I.

The purpose of HRS chapter 584 is to provide a method whereby certain parties may ascertain the identity of the natural or biological father of a subject child. Confirming a paternity determination made in a divorce proceeding, when the issue has not been actually and fully litigated, as the majority does, violates the purpose evident in HRS chapter 584. Accordingly, I cannot agree with the majority's view that the iden-

tity of a child's natural and biological father, as set forth in a divorce action that does not actually and fully litigate the question of a child's paternity, is to be given *res judicata* status. Because the issue of the genetic identity of Son's natural or biological father is at the heart of a paternity action, I believe it is wrong to bind Respondent/Plaintiff Appellant Jane Doe (Mother) to a decision that purportedly established Presumed Father as Son's natural or biological father in such a previous divorce action.

### II.

At odds with the purpose of chapter 584, the majority contends that (1) *res judicata* may prevent a party from asserting or denying paternity under HRS chapter 584 when a previous divorce decree has already adjudicated paternity, *see Doe v. Doe*, 99 Hawai'i at 5–6, 52 P.3d at 259–260 (2002) [hereinafter op.], and (2) under the facts of the instant case, issue preclusion bars Mother from bringing an action against Petitioner/Defendant Appellee John Doe (Alleged Father) to

*opinion.*" (internal section numbering omitted; (emphasis added)); Indiana Rules of Appellate Procedure, Rule 65 ("A judge who dissents from a not-for-publication memorandum decision *may designate the dissent for publication* if one (1) of the criteria above is met." (emphasis added)); Louisiana Revised Statutes, Uniform Rules, Courts of Appeal, Rule 2–16.2 ("An opinion may also be published *if it is accompanied by a concurring or dissenting opinion ....*" (emphasis added)); Rules of the Supreme Court of Kansas, Rule 7.04 ("*A memorandum opinion shall not be published unless there is a separate concurring or dissenting opinion in the case, and the author of such separate opinion requests that it be reported;* or unless it is ordered to be published by the Supreme Court.... Concurring and dissenting opinions shall be published only if the majority opinion is published." (emphasis added)); North Dakota Supreme Court Administrative Rules, Rule 27, Section 14(c) ("*The opinion may be published only if one of the three judges participating in the decision determines that one of the standards set out in this rule is satisfied.* The published opinion must include concurrences and dissents.") (emphasis added)); South Carolina Appellate Court Rules, Rule 220 ("The Supreme Court *may file a memorandum opinion* dismissing an appeal, affirming or reversing the judgment appealed from, or granting other appropriate relief *when, in unanimous decision, the Supreme Court determines that a published opinion would have no precedential value* and any

one or more of the following circumstances exists and is dispositive of issues submitted to the Court for decision: (A) that a judgment of the trial court is based on findings of fact which are not clearly erroneous; (B) that the evidence to support a jury verdict is or is not insufficient; (C) that the order of an administrative agency is or is not supported by such quantum of evidence as prescribed the statute or law under which judicial review is permitted; or (D) that no error of law appears." (emphases added)); Texas Rules of Appellate Procedure, Rule 47.5 ("*A concurring or dissenting opinion may be published if, in the judgment of its author, it meets one of the criteria established in 47.4.* If a concurrence or dissent is to be published, the majority opinion must be published as well." (emphasis added)).

1. As explained in *Black's Law Dictionary* 480 (6th ed.1990),

 DNA profiling or fingerprinting is an analysis of Deoxyribonucleic Acid (DNA) resulting in the identification of an individual's patterned chemical structure of genetic information[; a] method of determining distinctive patterns in genetic material in order to identify the source of a biological specimen, such as blood, tissue or hair[; a] forensic technique used in ... paternity cases to identify, or rule out, father of child.
 (Citations omitted.)

establish paternity under HRS § 584–6 (1993), *see id.* at 10–11, 52 P.3d at 264–65. Plainly, the application of the doctrine of issue preclusion in this case is incorrect.

The majority relies upon *Dorrance v. Lee*, 90 Hawai'i 143, 976 P.2d 904 (1999), for its rule of issue preclusion. *See* op. 99 Hawai'i at 10–11, 52 P.3d at 264–65. In defining that doctrine, however, the majority omits an important requirement of that doctrine, *i.e.*, that "[i]ssue preclusion, or collateral estoppel, on the other hand, applies to a subsequent suit between the parties or their privies on a different cause of action and prevents the parties or their privies from re-litigating any issue that was *actually litigated* and finally decided in the earlier action." *Dorrance*, 90 Hawai'i at 148, 976 P.2d at 909 (emphasis and citation omitted) (emphasis added). "[T]he interest in providing an opportunity for a considered determination . . . outweighs the interest in avoiding the burden of relitigation." *Id.* at 149, 976 P.2d at 910 (internal quotation marks and citation omitted).

Actual litigation is defined as "[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined[.]" Restatement (Second) of Judgments § 27 cmt. d (1980). By contrast, a determination is not conclusive "as to issues which might have been but were not litigated and determined in the prior action." *Id.* § 27 cmt. e. As explained in the Restatement,

> [a]n issue is not actually litigated if the defendant might have interposed it as an affirmative defense but failed to do so; nor is it actually litigated if it is raised by a material allegation of a party's pleading but is admitted (explicitly or by virtue of a failure to deny) in a responsive pleading; nor is it actually litigated if it is raised in an allegation by one party and is admitted by the other before evidence on the issue is adduced at trial; nor is it actually litigated if it is the subject of a stipulation between the parties.

*Id. In the present case, Son's paternity was never actually litigated in the divorce proceeding.* The divorce decree stated that "[t]here are two children[,] the issue of this marriage[,]" but whether Presumed Father was, indeed, the natural or biological father of Son was never actually litigated. Instead, the divorce decree is more analogous to the examples of non-litigated circumstances cited in the Restatement comment above, such as when an admission is made and evidence relating to the issue is never heard before a court and a considered judgment is never made. This view applies to paternity actions:

> Where the paternity question is not contested in the divorce action, but a finding of paternity is made, the cases are not in agreement on the effect of the decision. *The Restatement (Second) of Judgments limits collateral estoppel to those cases in which an issue is "actually litigated", defining that phrase to mean that the issue was properly raised by pleadings or otherwise, was submitted for determination and was determined.* Some of the divorce cases would apparently go beyond the Restatement and hold that if a finding of paternity is made, even though not contested, it is binding on the husband in later proceedings. Others have held that if paternity was not actually contested in the divorce action, a husband or wife may raise and litigate the issue in later proceedings.

2 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 18.1, at 354–55 (2d ed.1987) (footnotes omitted).

Accordingly, issue preclusion, as argued by Alleged Father and Presumed Father, is not applicable in the instant case.

### III.

#### A.

Moreover, contrary to the majority's assertion, our case law does not support a finding of *res judicata* when paternity is not actually litigated in a divorce action, and then later challenged. In *Blackshear v. Blackshear*, 52 Haw. 480, 478 P.2d 852 (1971), the issue was whether the paternity of two of four minor children born to appellee Grace Blackshear (Mrs. Blackshear) while she was married to appellant Roy Blackshear (Mr. Blackshear) could be contested by way of a motion to modify child support, three years after their divorce decree was granted. In the course of

the divorce, the parties had filed with the trial court an agreement which specified in a separate provision the amount of child support to be paid for the support of the four minor children. *See id.* at 481, 478 P.2d at 853. The four children were designated by name. *See id.* The agreement was approved by the court and incorporated into the divorce decree. *See id.* There was no evidence that the parties had been separated any time prior to the divorce, or that the question of paternity had arisen at the time of the divorce. *See id.*

Several years later, Mr. Blackshire filed a motion to modify the agreed upon child support payments, due to alleged extraordinary expenses and for other reasons. *See id.* Mr. Blackshire also sought to have evidence placed into the record that two of the four children were not, in fact, his. *See id.* The family court determined that it had no jurisdiction to alter the terms of the child support agreement. *See id.* With regard to the attempt by Mr. Blackshire to raise the question of the children's paternity, the family court concluded that "[t]he matter of legitimacy was found to be res judicata." *Id.* Mr. Blackshire appealed.

On appeal, the majority of this court's analysis dealt with the question of jurisdiction to modify the child support agreement. As to the question of paternity, this issue was summarily dismissed with no analysis. As observed by the Intermediate Court of Appeals (ICA) in its opinion, *see Doe v. Doe,* 99 Hawai'i 24, 52 P.3d 278 (2001) [hereinafater "ICA opinion"], the *Blackshear* court held, without any discussion, that Mr. Blackshear's "position as to [the children's] parentage is without merit, this issue having been finally adjudicated below." *Id.*

### B.

The ICA majority concluded that *Blackshear* was decided under *prior law* and is thus distinguishable from the instant case. Prior to the adoption of the Uniform Parentage Act (UPA),[2] paternity and legitimacy

were treated very differently than under current law. Under prior law, a child born to a married woman was presumptively the child of the mother's husband. *See McMillan v. Peters,* 30 Haw. 574, 578 (1928) ("When a child is born during the existence of a valid marriage the presumption is that it was begotten by the husband. Under certain conditions this presumption is one of law and therefore irrebuttable. Under others it is one of fact and therefore rebuttable."). Provisions relating to paternity occurred both in the statutes dealing with divorce and in a separate chapter, Revised Laws of Hawai'i (RLH) chapter 332 (1955), the precursor to HRS chapter 584. Only under these provisions could the presumption of legitimacy be rebutted; otherwise, the presumption was irrebuttable.

The rebuttability of the presumption was very limited under the statutes. Under RLH chapter 332, establishment of paternity could be petitioned for, but only under limited circumstances and never by the husband. RLH § 332–1 provided that

> [a]ny unmarried woman or any married women [sic] who was separated from and was not living with her husband prior to and at the time her child was conceived, when her pregnancy can be determined by competent medical evidence, or within two years after the delivery of her child, may petition ... for an adjudication of paternity and for other relief under the provision of this chapter against the person whom she alleges is the father of such child.

RLH § 324–43 (1955), pertaining to divorce actions, allowed a husband to raise the question of paternity, but only when the divorce was predicated upon an allegation of adultery by the wife, and the legitimacy of the children was questioned. *See id.* ("A divorce [based on the wife's] adultery ... shall not affect the legitimacy of the issue of the marriage, but the legitimacy of such children, if questioned, shall be tried and determined by the judge. In ... such case the legitimacy of such children shall be presumed, until the

---

2. The Uniform Parentage Act was adopted in 1975 and became effective on January 1, 1976.

*See* 1975 Haw. Sess. L. Act 66, at 115–26.

contrary is shown."). No statutory authority existed for a husband to question the paternity of a child after that one opportunity in the divorce statute had elapsed, unused. Accordingly, under the law at the time of *Blackshear*, if the question of paternity was not raised under those circumstances, the presumption of legitimacy was irrebuttable.

As noted *supra*, the Blackshears were apparently living together at the time of conception. Thus, Mr. Blackshear's opportunity to challenge the paternity of the two children could only be made at the time of the divorce pursuant to RLH § 324-43, and then only if Mrs. Blackshear was accused of adultery. This, apparently, was not the case. Mr. Blackshear could not reopen his divorce proceeding to question paternity of the two children, because there was no statutory authority for him to do so, inasmuch as that action could not be raised by a presumed or alleged father under any circumstances. Mr. Blackshear also lacked standing to raise the paternity issue under RLH chapter 332, as RLH § 332-1 excluded presumed or alleged husbands from bringing an action under that chapter. Hence, the *Blackshear* court could have determined that the presumption of paternity was, at the time of Mr. Blackshear's motion, irrebuttable.

The ICA majority relied solely upon RLH § 332-1, the existing paternity chapter, in concluding that, "[i]n light of [RLH] § 332-1 (1955), claim preclusion is not the only reasonable interpretation" of *Blackshear*'s unexplained statement. ICA opinion, 99 Hawai'i at 34, 52 P.3d at 290. Under that section, Mr. Blackshear had no standing to challenge the paternity of the children. I would observe that the *Blackshear* court could also have relied upon RLH § 324-43 in determining that, at the time of his motion, Mr. Blackshear's claim of non-paternity was irrebuttable and, thus, *res judicta*, because no statute allowed him to reopen the divorce proceedings. Hence, under the statutory context at the time of the *Blackshear* decision, as noted by the ICA, the paternity provisions at that time did not allow Mr. Blackshear any other avenue for challenging paternity.

C.

Unlike the law in 1955, the current divorce statutes no longer expressly authorize paternity determinations, except when the divorce action is joined with an action for paternity under HRS chapter 584. *See* HRS § 584-8(a) (Supp.2001) ("The [action brought under HRS chapter 584] may be joined with an action for divorce, annulment, separate maintenance, or support."). HRS § 571-50 (Supp.2001), relating to the ability of a family court to modify an order or decree, states that the court's authority in this respect is limited for paternity determinations by the provisions in HRS chapter 584:

> Notwithstanding the foregoing provisions of this section the court's authority with respect to the review, rehearing, renewal, modification, or revocation of decrees, judgments, or orders entered in the hereinbelow listed classes of proceedings shall be limited by any specific limitations set forth in the statutes governing these proceedings or in any other specifically applicable statutes or rules. These proceedings are as follows: ... [p]aternity proceedings under chapter 584[.]

Moreover, HRS chapter 584 does not provide for *res judicata* effect of divorce decrees or any other adjudication affecting the ability of parties to seek a paternity determination under its own provisions. It does, however, specifically address the *res judicata* effect of an order obtained under HRS chapter 584 on other proceedings, providing that a ruling under HRS chapter 584 "shall be determinative for all purposes." HRS § 584-15 (Supp. 2001). Thus, in light of the change in our statutes, *Blackshear* does not provide authority that *res judicata* bars a subsequent paternity action based upon a prior divorce decree that did not actually litigate the question of paternity.

IV.

In its decision, the majority makes the blanket statement that the purpose of HRS chapter 584 is to provide each child with an identifiable legal father. *See* op. 99 Hawai'i at 8, 52 P.3d at 262. In thus construing HRS chapter 584, the majority suggests that this

purported purpose may outweigh the truth of paternity, rendering the genetic heritage of a child, such as Son, unavailable to him and irrelevant to a paternity determination. I strongly disagree with these assertions. In the age of genetic testing, these suggestions are, frankly, and with all due respect, astounding.

In its opinion, the majority states that it "disagree[s] with the ICA that the policy enunciated by chapter 584 is to permit a 'presumptively legitimate child of questionable parentage' to 'know the truth of her [or his] parentage[.]'" Op. 99 Hawai'i at 7, 52 P.3d at 261 (alterations in original) (quoting ICA opinion 99 Hawai'i at 35, 52 P.3d at 289). In opposition, the majority asserts that the purpose of the UPA "is to ensure that every child, to the extent possible, has *an* identifiable legal father." Op. at 8, 52 P.3d at 262 (emphasis added). This is plainly incorrect. As an initial matter, the majority misconstrues the purpose of the UPA, and from this faulty and dated understanding of "paternity," the majority's other erroneous conclusions flow. Therefore, the statutory language of HRS chapter 584, Hawai'i's version of the UPA, and the correct context of the UPA must be examined.

### V.

The determination of paternity relates not to the ascertainment of a legal father, but to the finding of the natural father. This is reflected in the statutory language in HRS chapter 584. HRS § 584–1 defines the "parent and child relationship" as including "the legal relationship existing between a child and the child's natural mother, between a child and father whose relationship as parent and child is established under this chapter, or between a child and the child's adoptive parents[.]" HRS § 584–3 (1993) describes the "parent and child relationship" as being between "a child and ... [t]he *natural* father[.]" HRS § 584–4 discusses the presumptions of fatherhood in terms of the natural father, describing the circumstances under which "[a] man is presumed to be the *natural* father of a child[.]"

Furthermore, HRS § 584–12 (Supp.2001) confirms that the "[e]vidence relating to pa-

ternity" includes, not familial ties between a child and a putative father, but evidence relevant to biological connections.

Evidence relating to paternity may include:

(1) Evidence of sexual intercourse between the mother and the alleged father at any possible time of conception;

(2) An expert's opinion concerning the statistical probability of the alleged father's paternity based upon the duration of the mother's pregnancy;

(3) Genetic test results, including blood test results, weighted in accordance with evidence, if available, of the statistical probability of the alleged father's paternity;

(4) Medical or anthropological evidence relating to the alleged father's paternity of the child based on tests performed by experts. If a man has been identified as a possible father of the child, the court may, and upon request of a party shall, require the child, the mother, and the man to submit to appropriate tests;

(5) A voluntary, written acknowledgment of paternity;

(6) Bills for pregnancy and childbirth, including medical insurance premiums covering this period and genetic testing, without the need for foundation testimony or other proof of authenticity or accuracy, and these bills shall constitute prima facie evidence of amounts incurred for such services or for testing on behalf of the child; and

(7) All other evidence relevant to the issue of paternity of the child.

*Id.* Nowhere in the provisions of HRS chapter 584 is there a suggestion that the purpose of the procedures included therein is to "ensure that every child, to the extent possible, has an identifiable legal father." Op. at 8, 52 P.3d at 262.

Rather, the language of HRS chapter 584 manifestly supports the ICA's reading of this section, that HRS chapter 584 is aimed at determining the natural or biological father of a subject child. *See* ICA opinion, 99 Hawai'i at 35, 52 P.3d at 289. Prior misunder-

standings of who the natural father is cannot bar a proceeding to determine the truth, should there be a difference between a child's natural father and the child's presumed father, because "[a] presumptively legitimate child of questionable parentage should know the truth of her [or his] parentage—both, if there is a difference, her [or his] natural and her [or his] legal parentage." *Id.* (quoting *Doe v. Roe*, 9 Haw.App. 623, 626–27, 859 P.2d 922, 924 (1993)).

## VI.

In consonance with this purpose, presumptions are set forth in HRS § 584–4 as an aid to determining the identity of the natural father of a subject child. Contrary to the majority's assertion that the network of presumptions incorporated in HRS § 584–4 were intended to "direct[ to] the court which competing presumption on the facts is founded on the weightier considerations of policy and logic[,]" Op. 99 Hawai'i at 8, 52 P.3d at 262, these competing presumptions were intended to provide inferences as to the identity of the natural or biological father of the subject child, because there was no conclusive scientific method available at the time. Thus, the UPA, as adopted by the legislature in 1975, relied upon the conflicting presumptions provision in HRS § 584–4, because of a dearth of reliable means by which to conclusively establish paternity.

The methods for determining the identity of the natural or biological father of a child have evolved over time. When initially used by courts to determine who was the true father of a child, the accuracy of blood grouping testing[3] was recognized in statistically excluding a putative father, in some cases. Unlike genetic testing, however, blood group testing was not always determinative, and

acts as a negative, rather than an affirmative test of paternity:

> Since millions of men belong to the possible groups and types, a blood grouping test cannot conclusively establish paternity. However, it can demonstrate nonpaternity, such as where the alleged father belongs to group O and the child is group AB. It is a negative rather than an affirmative test with the potential to scientifically exclude the paternity of a falsely accused putative father.

*Little v. Streater*, 452 U.S. 1, 7, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981). "The substantial weight of medical and legal authority attests their accuracy, *not to prove paternity and not always to disprove it*, but 'they can disprove it conclusively in a great many cases provided they are administered by specially qualified experts.' " *Id.* (emphasis added) (quoting *Cortese v. Cortese*, 10 N.J.Super. 152, 76 A.2d 717, 719 (Ct.App.Div.1950)).

On the other hand, genetic testing "can statistically exclude the rest of the world's male population by a probability formula. Thus, the putative father can now be conclusively included into the set of possible fathers which is infinitesimally small. Accordingly, the likelihood that a properly conducted positive paternity test is wrong is astronomically remote." E. Donald Shapiro, Stewart Reifler, & Claudia L. Psome, *The DNA Paternity Test: Legislating the Future Paternity Action*, 7 J.L. & Health 1, 3–4 (1992–93) [hereinafter *The DNA Paternity Test*].

## VII.

When the UPA was first formulated in 1973, genetic testing, with its high degree of accuracy, was not available. *See* Nat'l Conf. of Comm'rs Unif. State Laws, *Summary: The Uniform Parentage Act*, http://

---

**3.** As explained by the Supreme Court:

> The application of blood tests to the issue of paternity results from certain properties of the human blood groups and types: (a) the blood group and type of any individual can be determined at birth or shortly thereafter; (b) the blood group and type of every individual remain constant throughout life; and (c) the blood groups and types are inherited in accordance with Mendel's laws. If the blood groups and types of the mother and child are known, the possible and impossible blood groups and types of the true father can be determined under the rules of inheritance. For example, a group AB child cannot have a group O parent, but can have a group A, B, or AB parent. Similarly, a child cannot be type M unless one or both parents are type M, and the factor rh' cannot appear in the blood of a child unless present in the blood of one or both parents. *Little v. Streater*, 452 U.S. 1, 7, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981) (internal citations omitted).

www.nccusl.org/nccusl /uniformact_summaries/uniformacts-s-upa.asp (last revised or amended 2000). The National Conference of Commissioners on Uniform State Laws originally provided for blood testing, the scientific method used at the time, but, as previously mentioned, blood testing did not conclusively establish who was the natural or biological father:

> The 1973 Uniform Act provided for blood testing in a paternity action. The results were evidence in that action. *The "blood" testing of the time could help identify a natural father, but was nowhere as certain and determinative as genetic testing* subject to rigorous standards as the 2000 Uniform Act contemplates. *Precise genetic testing has changed determination of parentage dramatically.*

*Id.* (emphases added). Because blood typing was not conclusive, the Commission created "[a] network of presumptions ... for application to cases in which proof of external circumstances indicate a particular man to be the probable father." UPA § 204 cmt. (2000). However, the 2000 revision to the UPA eliminates the conflicting presumptions provision, because "[t]he existence of modern genetic testing obviates this old approach to the problem of conflicting presumptions when a court is to determine paternity." *Id.*

## VIII.

The majority contends that "the genetic presumption is not more important than the other presumptions; it is one of several that must be considered in light of the fundamental purpose of [HRS] chapter 584." 99 Hawai'i at 8, 52 P.3d at 262. This statement misapprehends the nature of the presumptions in HRS § 584-4, and apparently views them, erroneously, as a mix of factors to be considered. The presumptions within HRS § 584-4 represent a *list* of inferences, rather than a mix of factors to be considered in determining who should be designated as the legal father of a child.

The presumptions are distinct from one another, and what is necessary to rebut one presumption may differ from what is required to rebut another presumption. For example, with the presumption that a man

not excluded as the natural father after genetic testing is the natural father, may be rebutted by challenging the reliability of the testing procedures or the results, *see, e.g., Cable v. Anthou*, 548 Pa. 551, 699 A.2d 722 (1997), or that the tester is not an expert qualified to perform paternity blood tests, *see, e.g., Bain v. State*, 56 Ark.App. 7, 937 S.W.2d 670, 673–74 (1997). As observed by the California Court of Appeal, genetic testing may be rebutted in such a way as challenges the test results themselves:

> First, if the defendant introduces evidence the expert testing was conducted improperly, or the wrong gene frequency table was used, or the opposing expert is biased, the defendant may demonstrate his paternity index is not 100 or more.... Second, the defendant may prove he is infertile or otherwise had no access to the mother during the period of conception.... Third, a defendant might prove another man who had access to the mother also has a high paternity index, which would raise a competing or "inconsistent" presumption. For example, two related men could have access to the mother.

*County of El Dorado v. Misura*, 33 Cal. App.4th 73, 38 Cal.Rptr.2d 908, 913–14 (1995). The presumption raised by the results of genetic testing are thus challengeable on the basis of the test results.

On the other hand, the presumption of legitimacy is challengeable on the basis of genetic testing demonstrating that another man has a high probability of paternity. *See, e.g., Tindle v. Gay*, 891 S.W.2d 617 (Tenn.Ct. App.1994). Thus, while the genetic testing presumption is one of several, the other presumptions—legitimacy, attempted marriage, legitimizing by marriage, holding out of the child as one's own, and voluntary acknowledgment—may be rebutted by the "clear and convincing" proof afforded by genetic testing. Hence, as stated by the ICA, the genetic testing presumption may be seen to control the other presumptions.

## IX.

The majority also erroneously suggests that the 1995 amendment to HRS § 584–4,

*see* 1995 Haw. Sess. L. Act 106, § 1, at 176, "*established* several legal presumptions that are to ·be employed in a paternity action." Op. 99 Hawai'i at 8, 52 P.3d at 262 (emphasis added). The 1995 amendment to HRS § 584-4 added the presumption of genetic testing to an already-existing list of presumptions. *See* 1995 Haw. Sess. L. Act 106, § 1, at 176.[1] Rather than including this presumption as simply "one of several [presumptions] that must be considered in light of the fundamental purpose of [HRS] chapter 584[,]" as maintained by the majority, op. at 8, 52 P.3d 262, the legislature amended the pre-existing presumptions for an entirely different reason.

The legislative history reveals that this provision was added in order to "ensure compliance with the requirements of the Omnibus Reconciliation Act of 1993."[5] Hse. Conf. Comm. Rep. No. 14, in 1995 House Journal, at 959. The provision, then, did not express a legislative intent that genetic testing be one of the mix of factors, subject to a policy that every child have an identifiable legal father; rather, the legislative intent was to comply with a federal mandate related to child support.

4. Act 106 also added the presumption of paternity based upon a voluntary acknowledgment of paternity filed with the department of health. *See* HRS § 584-4(6) (Supp.2001).

5. The Omnibus Reconciliation Act of 1993 required that states meet certain thresholds in establishing paternity of non-marital children each year:

[T]he Omnibus Budget Reconciliation Act of 1993, established new paternity establishment percentages[, *i.e.*, the total number of non-marital children in the State under one year of age for whom paternity is established or acknowledged during the fiscal year, to the total number of non-marital children born in the State during such fiscal year,] which States must meet in operating their child support enforcement programs. The bill also made technical changes in how the paternity establishment percentage is calculated.

139 Cong. Rec. S15942 (daily ed. Nov. 17. 1993) (Statements on Introduced Bills and Joint Resolutions). Under the State Paternity Programs, each state was required to create "[p]rocedures which create a rebuttable or, at the option of the State, conclusive presumption of paternity upon genetic testing results indicating a threshold probability that the' alleged father is the father of the child." 139 Cong. Rec. H5881 (daily ed. Aug. 4, 1993) (Conf. Rep. on H.R.

As noted *supra*, the provision relating to genetic testing was not included as a presumption until 1995. *See* 1995 Haw. Sess. L. Act 106, § 1, 176. Accordingly, Hawai'i's adoption of the UPA, incorporated as HRS chapter 584, encompassed the "old approach" that the network of presumptions was required, because no sufficiently exact method of determining who was the natural or biological father existed. The inclusion of genetic testing as a recognized method of determining paternity in 1995 obviates other presumptions. Thus, when genetic testing is conducted, depending upon the results of that test, it is determinative of who the natural or biological father is, subject to rebuttal challenges to the test results. If genetic testing is not conducted, the network of ·presumptions apply, because, without genetic testing, those assumptions are helpful in assessing who is likely to be the natural or biological father.

## X.

Also, the policy behind the UPA, as stated in our case law, is to provide for a legal

2264, Omnibus Budget Reconciliation Act of 1993).

The purpose of these provisions was to aid in child support enforcement.

The Child Support Enforcement Program was enacted as part of the Social Security Act in 1975. The States operate their own programs within Federal law and regulations. The Federal Government pays for 66 percent of the administrative costs. States are responsible for establishing paternity, locating absent parents, establishing child support orders, and enforcing child support. The Federal role includes monitoring and evaluating State programs, providing technical assistance, and in certain instances, helping States locate absent parents and collect child support payments. The Internal Revenue Service (IRS) collects some child support in arrears by offsetting income tax refunds otherwise due to taxpaying obligors.

. . . .

*The provision would require each State to have in effect laws requiring the use of additional procedures ... which create a rebuttable or, at the option of the State, conclusive presumption of paternity upon genetic testing results indicating a threshold probability of the alleged father being the father of the child[.]*

*Id.* at H6018.

relationship between a child and his' or her natural or biological parents and for the child to know the truth about his or her parentage. As declared by the ICA in *Doe v. Roe,* the purpose of HRS chapter 584 is not to "give [children] parents." 9 Haw.App. at 626, 859 P.2d at 924.

> From its inception in 1975, HRS § 584–6(a) permitted certain specified person to bring an action for the purpose of declaring the "nonexistence" of the father and child relationship. The language expressly allowing a presumed father to bring such an action was added to HRS § 584–6(a) by Act 224, § 1, 1991 Haw. Sess. Laws 518, effective June 6, 1991. Thus, *the family court was wrong in stating that "the purpose of the Uniform Parentage Act is not to take fathers from kids, but to give them parents."*

*Id.* The UPA plainly establishes that the biological parentage of a child may be a separate matter from the legal parentage of a child, and both are relevant.

Additionally, our statutes establish that the purpose of HRS chapter 584 is not simply to assure that every child has an *assigned* father but, rather, that every child be assured of some legal relationship to his or her *natural or biological* father. Had our laws been intended to ensure the former, paternity of a child born to a married mother would be conclusive. No provision would be made that would allow such a presumption to be rebutted. There would be no need to, inasmuch as the child would have "an identifiable *legal* father." Op. 99 Hawai'i at 8, 52 P.3d at 262 (emphasis added). By contrast, HRS chapter 584 endeavors to allow various interested parties to ascertain the identity of the natural father of the child.

## XI.

Public policy supports an accurate determination of the truth of a child's genetic parentage, regardless of who instigates the action. The United States Supreme Court has stated that a child and an alleged father share an interest "in an accurate and just determination of paternity." *Little,* 452 U.S. at 14, 101 S.Ct. 2202. As the ICA observed, the child's interests in such a determination should predominate, due to the importance of accurately ascertaining the rights, benefits, and knowledge of his or her genetic heritage. "A child's interests in an accurate paternity determination are broader than the interests of all others and include support, inheritance, and medical support. An accurate determination of paternity results in intangible, psychological, and emotional benefits for the child, including familial bonds and learning of cultural heritage." *In re State, Div. of Child Support Enforcement, ex rel. NDB,* 35 P.3d 1224, 1228 n. 7 (Wyo.2001) (citing *Hall v. Lalli,* 194 Ariz. 54, 977 P.2d 776, 781 (1999)).

These policies of allowing a child to know the truth of his or her parentage and to participate as the natural or biological child in the resources of his or her parent do not support a blind following of an unlitigated conclusion as to paternity. When paternity is not fully litigated in the divorce proceeding, the "truth" is not brought to light, and the child's substantial interests are ignored. Given the accuracy of genetic testing, the majority's conclusion that such testing is only one of many factors to consider is simply untenable.

Accordingly, I would affirm the ICA's decision and remand this case for further proceedings consistent with its opinion.