54 P.3d 441

Seagram FLORES, Plaintiff–Appellant,

v.

Renee BARRETTO, Defendant–Appellee.

and

John Does 1–10, Jane Does 1–10, Doe Partnerships, Corporations, and/or Other Entities 1–10, Defendants.

No. 23071.

Supreme Court of Hawai'i.

Sept. 24, 2002.

Reconsideration Denied Oct. 23, 2002.

Samuel R. Blair and Waiyee Carmen Wong, Koloa, on the briefs, for plaintiff-appellant.

Deborah S. Jackson, for defendant-appellee.

NAKAYAMA, RAMIL, and ACOBA, JJ.; ACOBA, J., concurring separately, with whom RAMIL, J., joins; and MOON, C.J., dissenting, with whom LEVINSON, J., joins.

Opinion of the Court by NAKAYAMA, J.

Plaintiff-appellant Seagram Flores appeals from the judgment of the fifth circuit court, the Honorable George M. Masuoka presiding, ordering Renee Barretto to pay Flores $8,239.15 in special damages and $7,500.00 in general damages, including court costs. On appeal, Flores asserts that the trial court erred when it concluded that a prior related arbitration finding was not binding upon it under the doctrine of collateral estoppel. For the reasons set forth below, we affirm the judgment of the trial court.

## I. BACKGROUND

On October 20, 1993, Flores and Dominique Gonsalves were passengers in an automobile driven by Dennis Barretto (Dennis) when their vehicle was struck by an automobile driven by defendant-appellee Renee Barretto.[1] Both vehicles were insured by AIG Hawai'i Insurance Company (AIG).

On November 2, 1993, Flores submitted a claim for no-fault benefits to AIG, alleging that he suffered neck and back injuries as a result of the October 20, 1993 accident.[2] AIG began paying benefits on Flores's initial claim, which included chiropractic treatment by Scott Basto, D.C. and massage therapy provided by Aloha Island Clinic.

On December 28, 1993, Basto submitted a three-month extended treatment plan [hereinafter, "the December 1993 Plan"] to AIG, recommending exercise, chiropractic adjustments, and massage therapy. The December 1993 Plan proposed treatments from January 1, 1994 through March 31, 1994 at an estimated cost of $5,200.00. AIG challenged the December 1993 Plan, and the challenge was submitted to peer review.[3] Despite AIG's challenge, Flores continued to receive chiropractic adjustments and massage therapy according to the December 1993 Plan.

On April 13, 1994, the peer review report disagreed with the December 1993 Plan, recommending no further chiropractic care be authorized for Flores, but recommended that massage therapy continue. The report further recommended that Flores be examined by an orthopedic surgeon or neurosurgeon for a second opinion regarding Flores's continued lower back pain. Based upon the peer review report, AIG denied coverage for the treatment proposed under the December 1993 Plan.

On May 18, 1994, Flores filed a request for arbitration regarding AIG's denial of coverage for the December 1993 Plan. On April 7, 1995, the arbitrator entered his decision and award. The arbitrator identified four issues:

1. Whether the provider's determination that the nature of Claimant's injuries and the process of recovery required a Treatment Plan resulting in fee schedules or

> (A) $10,000 for benefits described in section 431:10C–103(10)(A)(i) and (ii); and
> (B) $10,000 for benefits described in section 431:10C–103(10)(A)(iii) and (iv).
>
> See also HRS § 431:10C(11) (1993) (defining no-fault).

---

1. Dennis and Renee Barretto were married at the time of this accident. They will be referred to by their first names to decrease any confusion.

2. Hawai'i Revised Statutes (HRS) § 431:10C–103(6) (1993) provides in relevant part that:

   > Maximum limit means the total no-fault benefits payable per person or, on the person's death, to the person's survivor on account of accidental harm sustained by the person in any one motor vehicle accident shall be $20,000, regardless of the number of motor vehicles involved or policies, to be applied as follows:

3. HRS § 431:10C–308.6 provides in relevant part that "[i]f an insurer desires to challenge treatment and rehabilitative services in excess of the fee schedules or treatment guidelines, the insurer may do so by filing, ... a challenge with the commissioner for submission to a peer review organization as provided in this section."

treatment guidelines being exceeded was correct.

2. Whether the Treatment Plan for chiropractic care, and the proposed expenses for chiropractic care, were appropriate and reasonable.

3. Whether the Insurer's denial of no-fault benefits was correct.

4. Whether the Insurer may require the challenged Treatment Plan to be resubmitted to a Peer Review Organization.

In his legal analysis and conclusions, the arbitrator stated that "[t]he first two issues concern whether the injuries suffered by the Claimant required services and treatment beyond those nominally allowed in the treatment guidelines." His conclusion was that Flores met his burden of proof as to the reasonableness and appropriateness of the December 1993 Plan, and that Flores was entitled to have AIG pay for the chiropractic and other treatment specified in the December 1993 Plan. The arbitrator concluded, insofar as the denial of no-fault benefits, the insurer had no grounds for denying coverage. After a lengthy discussion, not applicable to the issues herein, the arbitrator finally concluded that there is no statute or procedure for resubmitting the denial of benefits to a peer review organization. The arbitrator ordered AIG to pay for the treatment prescribed in the December 1993 Plan. No motion to vacate, modify, or correct the arbitration award was made, and neither party moved to confirm the arbitrator's decision as provided by HRS § 658-8 (1993).[4]

On February 22, 1994, Flores and Gonsalves filed a complaint in the circuit court of the fifth circuit, alleging that Renee's negligence was the direct and proximate cause of their injuries. On June 21, 1996, Gonsalves and Renee filed a stipulated dismissal with prejudice of Gonsalves's complaint. On August 9, 1996, Flores filed a motion for partial summary judgment on liability. Flores requested the circuit court rule that: (1) Flores was not comparatively negligent; and (2) Renee was negligent as a matter of law in causing the collision. Renee, in her memorandum in opposition to Flores's motion for partial summary judgment, did not dispute the issue of liability, but contested the issues of causation, damages, and intent. Renee stated that there were genuine issues of material fact regarding whether Renee's action was intentional, issues not relevant to liability.

In a jury-waived bench trial, Flores argued that he sought compensation for his injuries, including the amount of medical expenses that exceeded the no-fault limits and damages for pain and suffering. Flores asserted that liability had already been established by the arbitrator's decision; therefore, AIG was required to pay the medical expenses previously determined reasonable and necessary and any pain and suffering damages. Conversely, AIG argued that the arbitrator was never called upon to determine the liability of Renee or AIG or the presence of pre-existing conditions. Rather, according to AIG, the arbitrator only determined whether the treatment plan complied with HRS chapter 431:10C (1993) as implemented pursuant to Hawai'i Administrative Rules (HAR) § 16-23-95.[5]

At the conclusion of the bench trial, the circuit court asked for written arguments.

4. HRS § 658-8 provides that:

The award shall be in writing and acknowledged or proved in like manner as a deed for the conveyance of real estate, and delivered to one of the parties or the party's attorney. A copy of the award shall be served by the arbitrators on each of the other parties to the arbitration, personally or by registered or certified mail. At any time within one year after the award is made and served, any party to the arbitration may apply to the circuit court specified in the agreement, or if none is specified, to the circuit court of the judicial circuit in which the arbitration was had, for an order confirming the award. Thereupon the court shall grant such an order, unless the award is vacated, modified, or corrected, as prescribed in sections 658-9 and 658-10. The record shall be filed with the motion as provided by section 658-13, and notice of the motion shall be served upon the adverse party, or the adverse party's attorney, as prescribed for service of notice of a motion in an action in the same court.

5. HAR § 16-23-95 sets forth, at length, the process by which a treatment provider will develop and present a treatment plan to the insurance carrier. It is fairly lengthy and can be obtained in full at *http://www.state.hi.us/dcca/har/index.html*. The rules stated at this site were in effect in 1993.

The court stated "I already ruled on negligence, so don't cover that at all. . . . It's only legal or proximate cause and substantial (inaudible). Okay? And the amount of damages." The circuit court entered its "Findings of Fact, Conclusions of Law [COL], Decision, and Order" on March 25, 1999. The circuit court's COL number 1, the subject of this appeal, provided that "[t]he arbitration award rendered in Special Proceeding No. 94–27, *Flores v. American Int'l Adjustment, et al.,* by arbitrator Max Graham, Esq., finding that Flores's no-fault benefits of $15,626.21 were reasonably and necessarily incurred, is not binding on this court on the issue of Flores's medical expenses, in the form of special damages, were reasonably and necessarily incurred in this action." Based upon this conclusion, the circuit court also concluded that Flores was to be awarded his expenses for treatment through December 31, 1993 as a matter of law, but not awarded expenses for treatment thereafter. Flores timely appealed.

## II. *STANDARD OF REVIEW*

We review the trial court's [conclusions of law] *de novo* under the right/wrong standard. *Raines v. State,* 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe,* 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

*Chun v. Board of Trustees of Employees Retirement Sys.,* 92 Hawai'i 432, 438–39, 992 P.2d 127, 133–34 (2000) (quoting *State v. Medeiros,* 89 Hawai'i 361, 364, 973 P.2d 736, 739 (1999)) (citation omitted).

## III. *DISCUSSION*

Based on the arbitrator's decision that treatment under the December 1993 Plan was compensable, Flores argues that the doctrine of collateral estoppel barred the trial court from subsequently ruling that treatments by Basto and Aloha Island Clinic after December 31, 1993 were not reasonable and necessary expenses. In essence, Flores argues that if an arbitrator in a no-fault proceeding determines that a defendant is liable for no-fault benefits, he or she is precluded from arguing issues of causation and actual damages in subsequent personal injury litigation. Such reasoning, if adopted, would drastically alter the function of no-fault insurance.

Hawaii's no-fault law was initially introduced in 1973. The purpose the no-fault law serves is

> to provide motor vehicle accident victims assured, adequate and prompt reparation for certain economic losses without regard to fault. The clear objectives of the law are to: (1) institute insurance reform in order to (a) expedite the settling of all claims, (b) create a system of reparations for injuries and loss arising from motor vehicle accidents, (c) compensate these damages without regard to fault, and (d) modify tort liability for these accidents; and (2) to reduce the cost of motor vehicle insurance by establishing a uniform system of motor vehicle insurance.

*Parker v. Nakaoka,* 68 Haw. 557, 559, 722 P.2d 1028, 1030 (1986) (citations omitted). *Hawaiian Ins. & Guar. Co., Ltd. v. Financial Sec. Ins. Co.,* 72 Haw. 80, 91, 807 P.2d 1256, 1262 (1991); *see also* Stand. Comm. Rep. No. 187, in 1973 House Journal, at 836; *Del Rio v. Crake,* 87 Hawai'i 297, 305, 955 P.2d 90, 98 (1998). Representative O'Connor, a co-chairman of the 1973 Conference Committee that reported on the no-fault bill, stated that the bill "provides for speedy payments of medical benefits, hospital benefits, rehabilitative benefits, loss of wages without regard to fault." HB 637, 17th Leg., Reg. Sess., House Journal, at 697 (1973). He explained that payments would be made "automatically to all of those who are involved in automobile accidents[.]" HB 637, 17th Leg.,

Reg. Sess., House Journal, at 697 (1973). In the twenty-nine years no-fault insurance has been mandatory in this state, the underlying purpose has never wavered. In 1992, our legislature reiterated its commitment to the no-fault principles when it stated that "the Legislature's intent and commitment to provide immediate relief to consumers and to maintain a persistent regulatory posture on motor vehicle rate increases[,]" continues unabated. Sen. Conf. Comm. Rep. No. 161, in 1992 Senate Journal, at 825–26. Underlying the no-fault principle has been the desire to decrease tort claims resulting from motor vehicle accidents. *See* HB 637, 17th Leg., Reg. Sess., House Journal, at 415 (1973); Stand. Comm. Rep. No. 187, in 1973 House Journal, at 836; Sen. Conf. Comm. Rep. No. 161, in 1992 Senate Journal, at 825; Stand. Comm. Rep. No. 1271–91, in 1992 House Journal, at 1390–91. This is evidenced by the fact that no-fault coverage is exclusively for bodily, emotional, or mental injuries. Reg. Sess, in 1973 House Journal at 697. The individual injured in a motor vehicle accident will be reimbursed for injury-related expenses without regard to fault. Tort law, on the other hand, "especially in the field of negligence, is to compensate injured parties for the wrongs of others[.]"[6] *Kailieha v. Hayes,* 56 Haw. 306, 320, 536 P.2d 568, 576 (1975). Flores asks this court to collaterally estop a defendant from litigating issues of causation and actual damages in the tort context if an arbitrator has rendered a decision in a no-fault arbitration proceeding.

■ Collateral estoppel has been defined by this court as "an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in a prior suit on a different claim between the same parties or their privies." *Marsland v. International Soc'y for Krishna Consciousness,* 66 Haw. 119, 124, 657 P.2d 1035, 1039 (1983). To successfully establish that AIG was estopped from relitigating issues, Flores had the burden of establishing that:

(1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final

judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication.

*Casumpang v. ILWU, Local 142,* 94 Hawai'i 330, 338, 13 P.3d 1235, 1243 (2000).

Flores argues that the

only issue at the bench trial was Plaintiff's damages. The only item of special damages was Plaintiff's medical expenses. To prove his medical expenses, Plaintiff had to prove that the Defendant caused the injuries, and the medical expenses were appropriate, reasonable, and necessarily incurred. This is the exact same issue Plaintiff had to prove in the arbitration.

Contrary to Flores's argument, the conclusions of the arbitrator did not include a determination of causation and actual damages in the context of tort litigation.

The relevant issues, as identified by the arbitrator, were whether (1) Flores required a treatment plan that would exceed the fee schedule, (2) the recommended treatment was appropriate and reasonable, and (3) AIG's denial of no-fault benefits was correct. The first issue of exceeding the fee schedule is a determination as to whether the extent of the proposed treatment was appropriate; thus, it was incumbent upon the arbitrator to determine if the proposed treatment was appropriate, considering the diagnosis made by the treating chiropractor. The arbitrator must then determine whether the treatment plan recommended by the provider was the optimum treatment for the given diagnosis.

The relevant inquiry is whether a claimant was in a motor vehicle accident compensable through the no-fault program. If the claimant was in a compensable motor vehicle accident, expenditures for medical treatment are expressly provided. *See* HRS § 431:10C–103(6). Fees in excess of the medical fee schedules are subject to a determination whether the treatment provider "finds that the nature of the injuries and the process of

---

6. Black's Law Dictionary defines a "wrongdoer" as "[o]ne who commits an injury; a *tortfeasor*."

Black's Law Dictionary (6th ed.1991) at 1110.

recovery require a treatment plan resulting in fee schedules or treatment guidelines to be exceeded." HRS § 431:10C–308.6. Dr. Basto found that exceeding the fee schedule for Flores's treatment was necessary. The next inquiry, then, is whether the excess is reasonable and necessary.

Flores argues that the arbitrator's determination that the medical expenses were reasonable and necessary is further evidence of identical issues. Flores states that "[t]o prove his medical expenses, [he] had to prove that [ ] [Renee] caused the injuries, and the medical expenses were appropriate, reasonable, and necessarily incurred." Whether expenses are reasonable and/or necessarily incurred has no bearing on whether Renee was the cause or that the expenses reflected actual damages from the motor vehicle accident.

"Reasonableness" is an objective standard. Medical fee schedules for the payment of medical expenses have been formally adopted by the legislature, using the workers' compensation fee schedule as its model. *See* HRS § 431:10C–308.5(b) (1993).[7] In adopting the workers' compensation fee schedule, the legislature determined that expenses, which fell within the schedule, would be considered appropriate and reasonable. *See* HAR § 16–23–115 (adopting the workers' compensation medical fee schedule). This means that the "reasonableness" determination is based upon whether the charges for treatment are consistent with the medical fee schedules and if so, they are presumed reasonable. "Reasonableness" bears no relation to whether the defendant in a no-fault action was the legal cause of the injury or even whether the injury as a whole resulted from the accident.

Similarly, the phrase "necessarily incurred" bears no relation to causation or actual damages. The phrase means whether the treatment involved increased the likelihood of recovery following an accident for which no-fault benefits were available. Proof that expenses were "necessarily incurred" may be demonstrated by evidence that the plaintiff improved under the treatment regime, that the regime facilitated pain management, or that as a result of the treatment regime the frequency of the medical intervention decreased. *See e.g., Uyeno v. United Servs. Auto./John Mullen & Co., Ltd.,* MVI–84–24, 86–2 Haw. Leg. Rptr. 86–657, 86–670 (1986) (stating that "a claimant must show some connection between the accidental harm and the treatment received, and between the treatment received and the relief of pain.").

In this case, the arbitrator was simply determining whether: (1) Flores was involved in a motor vehicle accident compensable through the no-fault program; (2) the type of treatment recommended was generally accepted in the medical community as the optimal treatment for the diagnosed condition; (3) the fees and frequency of treatment was consistent with the medical fee schedule; and (4) there was either curative or palliative improvement as a result of the treatment. The circuit court addressed none of these issues.

## IV.  CONCLUSION

Because the requirements of collateral estoppel are conjunctive, rather than disjunctive, only one element need be disproved to defeat Flores's contention. *See State v. Crouser,* 81 Hawai'i 5, 11, 911 P.2d 725, 731 (1996); *Baehr v. Miike,* 80 Hawai'i 341, 345, 910 P.2d 112, 116 (1996) ("Because the requirements of intervention by right are stated in the conjunctive, it is necessary for Applicants to meet all four criteria[.]"). The arbitrator made a determination of whether Flores's injury was compensable and if so to what extent was his treatment reasonable and necessarily incurred. The circuit court determined whether Renee was the legal or proximate cause of the injury and if so, which if any actual damages resulted. The issues

---

7.  HRS § 431:10C–308.5(b) provides in relevant part that

effective January 1, 1993, the charges and frequency of treatment for services specified in section 431:10C–103(10)(A)(i) and (ii), except for emergency services provided within seven-ty-two hours following a motor vehicle accident resulting in injury, shall not exceed the charges and frequency of treatment permissible under the workers' compensation schedules, except as provided in section 431:10C–308.6.

were not identical; therefore, Flores cannot successfully claim that Renee is collaterally estopped from litigating causation. We affirm the judgment of the circuit court.

### Concurring Opinion of ACOBA, J., with whom RAMIL, J., Joins.

I agree that the question of AIG Hawai'i Insurance Company's insured's liability for injuries suffered by Plaintiff Appellant Seagram Flores that was germane to the court tort action was not actually litigated in the arbitration proceeding concerning payment of no fault benefits.[1] As indicated by the arbitrator's rendition of the issues decided, such liability was not decided by him. Consequently, his decision could not be given preclusive or collateral estoppel effect with respect to tort liability in the subsequent trial: "Issue preclusion, or collateral estoppel . . . applies to a subsequent suit between the parties or their privies on a different cause of action and prevents the parties or their privies from relitigating any issue [if] that [issue] was *actually litigated* and finally decided in the earlier action." *Dorrance v. Lee*, 90 Hawai'i 143, 149, 976 P.2d 904, 910 (1999) (emphasis and citation omitted) (emphasis added). The basis for requiring prior *actual* litigation is "the interest in providing an opportunity for a considered determination . . . [which] outweighs the interest in avoiding the burden of relitigation." *Id.* at 149, 976 P.2d at 910 (internal quotation marks and citation omitted).

In my view, we have never abandoned the requirement that an issue in question must have been actually litigated in a prior pro-

---

1. I agree with publication of this opinion because an opinion should be published if an existing rule of law is applied to a factual situation significantly different from those in previously published opinions. *See, e.g.*, 5th Cir. R. 47.5.1 (stating that an opinion is published if it "applies an established rule of law to facts significantly different from those in previous published opinions applying the rule"). The need for publication of opinions to give guidance to the parties, counsel, trial courts, and the public cannot be understated.

On June 14, 2002, the Hawai'i Chapter of the American Judicature Society (AJS) submitted the "Report of the AJS Committee Reviewing Unpublished Opinions" (the Report) to the justices of the Hawai'i Supreme Court for our consideration, recommending that this court adopt an amendment to the Hawai'i Rules of Appellate Procedure (HRAP) Rule 35. The Report explained that "[t]here is a problem perceived by the legal community with the continued use of summary disposition orders and, particularly, the inability to cite memorandum opinions despite the fact that these opinions appear to be of substantial length and content and often cite other case law as precedent for the conclusions." The Report at 4.

The AJS recommendation, *inter alia*, suggests an amendment to HRAP Rule 35 which would permit (1) citation to unpublished opinions as persuasive authority and (2) petitions for publication of unpublished cases. The Report at 18, 20. The recommendation would obviously affect the development of law for civil cases. The suggested amendment adds a new subsection c and realphabetizes and supplements the current subsection c as follows:

(c) *Application for Publication. Any party or other interested person may apply for good cause shown to the court for publication of an unpublished opinion.*

[(c)] (*d*) Citation. A memorandum opinion or unpublished dispositional order shall not be *considered nor shall* be cited in any other action or proceeding *as controlling authority*, except when the opinion or unpublished dispositional order establishes the law of the pending case, re [sic] judicata or collateral estoppel, or in a criminal action or proceeding involving the same respondent.

*In all other situations, a memorandum opinion or unpublished dispositional order may be cited in any other action or proceeding if the opinion or order has persuasive value.* A party who cites a memorandum opinion or unpublished dispositional order shall attach a copy of the opinion or order to the document in which it is cited, as an appendix, and shall indicate any subsequent disposition of the opinion or order by the appellate courts known after diligent search. If an unpublished decision is cited at oral argument, the citing party shall provide a copy to the court and the other parties. When citing an unpublished opinion or order, a party must indicate the opinion's unpublished status.

The Report at 22 (underscoring and brackets in original). This court has yet to decide on the suggested amendment.

Justice Ramil has also proposed a rule which would require publication of a case at the request of one justice. Thus, a decision would be published when the case is decided by unanimous decision, if, "[a]fter an exchange of views," any single justice votes for publication; or for publication of opinions "with a dissent or with more than one opinion . . . unless *all* participating judges decide against publication." *Doe v. Doe*, 99 Hawai'i 1, at 15, 52 P.3d 255, at 269 (2002) (Ramil, J., dissenting) (quoting Rule 36(b)(2) of the United States Court of Appeals of the First Circuit) (emphasis added).

ceeding before the affected party may be bound in a subsequent case. "Actual litigation is defined as '[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined[.]'" *Doe v. Doe,* 99 Hawai'i 1, 52 P.3d 255, 271 (2002) (concurring opinion of Acoba, J., joined by Ramil, J.) (quoting Restatement (Second) of Judgments § 27 cmt. d (1980)). To hold otherwise would be fundamentally unfair. See *Tradewind Ins. Co. v. Stout,* 85 Hawai'i 177, 187, 938 P.2d 1196, 1206 (App.) (observing that " '[i]ntertwined with the concepts of privity for collateral estoppel purposes' are 'the requirements of due process[,]'" and that "[i]t would be a violation of due process for a judgment to be binding on a litigant who was not a party or privy and therefore has never had an opportunity to be heard" (quoting *Safeco Ins. Co. v. Yon,* 118 Idaho 367, 796 P.2d 1040, 1044 (Idaho Ct. App.1990))), cert. denied, 85 Hawai'i 81, 937 P.2d 922 (1997).

For the foregoing reasons, I concur in the result.

**Dissenting Opinion by MOON, C.J., in Which LEVINSON, J., Joins.**

I respectfully dissent from the majority's holding because I believe that the doctrine of collateral estoppel applies in this case and that the trial court was bound by the arbitrator's decision.

Based on the arbitrator's decision that treatment under the December 1993 Plan was compensable, Flores argues that the doctrine of collateral estoppel barred the trial court from subsequently ruling that treatments by Basto and Aloha Island Clinic after December 31, 1993 were not reasonable and necessary medical expenses. This court has stated that

> [c]ollateral estoppel is an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in a *prior suit* on a different claim between the same parties or their privies. Collateral estoppel also precludes relitigation of facts or issues previously determined when it is raised defensively by one not a party in a *prior suit* against one who was a party in that suit and who himself

[or herself] raised and litigated the fact or issue.

*Dorrance v. Lee,* 90 Hawai'i 143, 148, 976 P.2d 904, 909 (1999) (emphasis in original) (ellipses omitted) (quoting *Foytik v. Chandler,* 88 Hawai'i 307, 314–15, 966 P.2d 619, 626–27 (1998)). We have previously held that a party may be estopped from relitigating issues previously determined by a Court Annexed Arbitration Program arbitrator. *Dorrance,* 90 Hawai'i at 150–51, 976 P.2d at 911–12. To establish collateral estoppel, or issue preclusion, and, thus, bar relitigation of the issue, four requirements must be met:

> (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication.

*Citizens for the Protection of the North Kohala Coastline v. County of Hawai'i,* 91 Hawai'i 94, 102, 979 P.2d 1120, 1128 (1999) (brackets omitted).

### A. Identical Issues

"[C]ollateral estoppel requires only that the issue decided in the prior adjudication be identical to the one presented in the present action[.]" *Dorrance,* 90 Hawai'i at 150, 976 P.2d at 911 (emphasis in original omitted). In the present case, the issue in both the arbitration and the civil trial was whether treatment under the December 1993 Plan was compensable. The arbitrator decided that the chiropractic and massage treatments specified in the December 1993 Plan were appropriate and reasonable; however, the trial court found otherwise. Barretto claims that the issues were not identical in the two proceedings because the arbitrator was not required to decide whether Flores's injuries were caused by Barretto's negligence, whereas the trial judge was required to make a determination as to causation. Although I agree that Barretto's negligence was not an issue in the arbitration proceeding, I disagree that the arbitrator was not required to

determine that Flores's injuries were causally related to the accident.

In the arbitration, Flores alleged that AIG improperly denied him chiropractic benefits proposed under the December 1993 Plan. Hawai'i Revised Statutes (HRS) § 431:10C–304(1)(B) (1993) outlines an insurer's obligation to provide no-fault benefits, stating that "[e]very no-fault insurer shall provide no-fault benefits for *accidental harm*," under specified conditions. (Emphasis added.) Accidental harm is defined as "bodily injury, death, sickness, or disease *caused by a motor vehicle accident* to a person." HRS § 431:10C–103(1) (1993) (emphasis added). Together, HRS §§ 431:10C–103(1) and –304 indicate that the liability of no-fault insurers is limited to injuries "caused by a motor vehicle accident." Therefore, a decision that a no-fault insurer must provide benefits under HRS chapter 431:10C necessarily requires finding a causal connection between the motor vehicle accident and the injuries sustained.

Similarly, HRS § 431:10C–103(10)(A) (1993) provides in pertinent part:

(A) No-fault benefits, sometimes referred to as personal injury protection benefits, with respect to any *accidental harm* means:

(i) All appropriate and reasonable expenses necessarily incurred for medical, hospital, surgical, professional, nursing, dental, optometric, ambulance, prosthetic services, products and accommodations furnished, and x-ray. The foregoing expenses may include any nonmedical remedial care

and treatment rendered in accordance with the teachings, faith, or belief of any group which depends for healing upon spiritual means through prayer;

(ii) All appropriate and reasonable expenses necessarily incurred for psychiatric, physical, and occupational therapy and rehabilitation[.]

(Emphasis added.) Thus, no-fault benefits include those appropriate and reasonable expenses necessarily incurred as a result of treatment received for injuries caused by a motor vehicle accident. In other words, the relevant no-fault statutes require that treatment for which benefits will be paid *must* be causally related to a motor vehicle accident. Accordingly, in deciding whether treatment under the December 1993 Plan was compensable, the arbitrator was necessarily required to determine (1) that Flores's injuries were causally related to the motor vehicle accident *and* (2) that chiropractic and massage treatments pursuant to the plan were reasonable in light of those injuries.[1] Moreover, the circuit court had already entered summary judgment in Flores's favor as to Barretto's negligence in causing the accident, and the circuit court found at trial that the accident caused Flores's injuries. Consequently, the issue of the compensability of treatment under the December 1993 Plan was identical in the arbitration and at trial.

## B. *Final Judgment on the Merits*

In the present case, the arbitration proceeding was conducted pursuant to HRS chapter 658. *See* HRS § 431:10C–213 (1993).[2] However, Barretto argues that the

---

1. I agree with the majority that the arbitrator was required to analyze whether Flores's injuries required a treatment plan that exceeded the no-fault guidelines and whether such treatment was appropriate and reasonable. However, a determination that Flores's injuries were caused by the motor vehicle accident was foundational to that analysis.

2. HRS § 431:10C–213 provides:
    (a) A claimant, insurer, or provider of services may submit any dispute relating to a no-fault policy to an arbitrator by filing a written request with the clerk of the circuit court in the circuit where the accident occurred.
    (b) The administrative judge of each circuit court shall maintain a current list of persons

qualified and willing to act as arbitrators and shall, within ten days of the date of filing of a request for arbitration, appoint an arbitrator from such list to hear and determine the claim.
    (c) *Except as otherwise provided herein, the arbitration shall be in accordance with and governed by the provisions of chapter 658.*
    (d) Any fee or cost of the arbitrator shall be borne equally by the parties unless otherwise allocated by the arbitrator.
    (e) An appeal may be taken from any judgment of the arbitrator to the circuit court in the manner provided for in rule 72 of the Hawaii Rules of Civil Procedure.
(Emphasis added.)

arbitrator's award had no preclusive effect on the trial court because the arbitrator's decision was not confirmed pursuant to HRS § 658–8 (1993) and, therefore, was not a final judgment according to HRS § 658–12 (1993).[3] I disagree.

Barretto relies upon *Oppenheimer v. AIG Hawai'i Ins. Co.*, 77 Hawai'i 88, 881 P.2d 1234 (1994), in which this court held that HRS § 658–12 allows direct appeals from orders confirming, modifying, or correcting an arbitration award. *Id.* at 92, 881 P.2d at 1238. However, appealability and finality are related but distinguishable concepts. *See generally Labayog v. Labayog*, 83 Hawai'i 412, 422, 927 P.2d 420, 430 (App.), *cert. dismissed*, 83 Hawai'i 545, 928 P.2d 39 (1996). Appellate jurisdiction and collateral estoppel implicate different policy concerns. For purposes of appellate jurisdiction, the requirement of a final judgment prevents piecemeal litigation. *Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 118–19, 869 P.2d 1334, 1337–38 (1994) (citing *Powers v. Ellis*, 55 Haw. 414, 417, 520 P.2d 431, 433 (1974)). However, the purpose of collateral estoppel is to prevent inconsistent results, prevent duplicative litigation, and promote finality and judicial economy. *See Dorrance*, 90 Hawai'i at 148–49, 976 P.2d at 909–10 (citations omitted). Thus, for purposes of collateral estoppel, the requirement of a final judgment ensures that the decision to be given preclusive effect is not tentative or subject to change. *See Glover v. Fong*, 42 Haw. 560, 574 (1958); *see also Kauhane v. Acutron Co., Inc.*, 71 Haw. 458, 465, 795 P.2d 276, 279 (1990) (holding that, once the plaintiff withdrew his appeal, the circuit court's judgment became final for res judicata purposes); *Silver v. Queens Hospital*, 63 Haw. 430, 439–40, 629 P.2d 1116, 1123–24 (1981) (holding that the plaintiff's claims were barred by res judicata when the federal court's judgment was finalized by denial of his petition for certiorari). Therefore, to determine whether the arbitrator's decision in this case had preclusive effect on the trial court requires an examination as to whether the arbitrator's decision was tentative or subject to change.

This court has noted that:

An arbitration award is considered to be final when consideration of the submitted issues has been concluded and a resolution reached. Although there is no requirement that the award be self-executing, and although "it is not faulty because litigation may ensue in enforcing it," it should be "sufficiently definite that only ministerial acts of the parties are needed to carry it into effect," and "clear enough to indicate unequivocally what each party is required to do."

*Wayland Lum Constr., Inc. v. Kaneshige*, 90 Hawai'i 417, 424, 978 P.2d 855, 862 (1999) (citations omitted). Here, the arbitrator resolved the issue submitted to him when he concluded that the treatment proposed under the December 1993 Plan was compensable. The award was sufficiently definite to indicate what each party was required to do, and AIG, in fact, paid for the disputed treatments. Once the arbitrator's decision was issued, HRS § 658–11 (1993) required that "[n]otice of a motion to vacate, modify, or correct [the] award ... be served ... within 10 days after the award [was] made and served." Failure to bring a timely motion to vacate, modify, or correct an arbitration award precludes a party from challenging the award. *Excelsior Lodge Number One v. Eyecor, Ltd.*, 74 Haw. 210, 222–23, 847 P.2d 652, 658 (1992). Because neither party moved to vacate, modify, or correct the arbitrator's decision in the present case, neither could challenge the award at the time of trial. Moreover, neither party moved to confirm the arbitration award pursuant to HRS § 658–8, thereby waiving their right to judicial review of the arbitrator's decision. *See generally Arbitration of Bd. of Directors of Ass'n of Apartment Owners of Tropicana Manor*, 73 Haw. 201, 213, 830 P.2d 503, 510 (1992). Thus, the arbitrator's decision was neither tentative nor subject to change. Accordingly, I would hold that, under the facts

---

**3.** HRS § 658–12 states in pertinent part, "Upon the granting of an order, confirming, modifying, or correcting an award, the same shall be filed in the office of the clerk of the circuit court and this shall constitute the entry of judgment. An appeal may be taken from such judgment as hereinafter set forth."

of this case, the arbitrator's decision was final for purposes of collateral estoppel.

## C. *Essential to the Final Judgment*

The sole issue in the arbitration was whether the treatment prescribed under the December 1993 Plan was compensable. Therefore, that determination was clearly essential to the arbitrator's final award.

## D. *Parties in Privity*

Regarding privity, this court noted:

As the preclusive effects of judgments have expanded to include nonparties in more and more situations[,] ... it has come to be recognized that the privity label simply expresses a conclusion that preclusion is proper. As to privity, current decisions look directly to the reasons for holding a person bound by a judgment.

*Bush v. Watson,* 81 Hawai'i 474, 480, 918 P.2d 1130, 1136, *reconsideration denied,* 81 Hawai'i 474, 918 P.2d 1130 (1996) (citation omitted). Under certain circumstances, an insurer and its insured may be deemed to be in privity for purposes of collateral estoppel based upon the obligations created by the insurance contract. *See, e.g., Medeiros v. First Ins. Co.,* 50 Haw. 401, 403, 441 P.2d 341, 343–44, *reh'g denied,* 50 Haw. 468, 441 P.2d 341 (1968). Generally speaking, an insured and his or her insurer share a common interest, that is, to limit liability in a tort action to within the policy limits. The common interest diverges where liability exceeds the policy limits, thus, exposing the insured to personal liability. However, as we noted in *Medeiros,* factors other than the obligations created by the insurance contract may influence whether parties should be deemed in privity:

We do not believe [holding that the insurer and the insured are in privity is] an unjust application of collateral estoppel in view of the alternative of embarrassment engendered by possible contradictory findings with respect to [the insured's] negligence in the tort suit against him and the one against the alleged insurer.... The Insurance Company is not a complete stranger to the relationship between the plaintiffs herein and [the insured]. Its

liability, if any, would be vicarious in the sense that it would be held liable to the plaintiffs only if, in the first place, [the insured] is found liable to the plaintiffs, and secondly, only if the factual basis of this liability brings him within the coverage of the policy.

*Id.* at 403–04, 441 P.2d at 344. Similarly, in *Tradewind Insurance Co., Ltd. v. Stout,* 85 Hawai'i 177, 938 P.2d 1196 (App.), *cert. denied,* 85 Hawai'i 81, 937 P.2d 922 (1997), the Intermediate Court of Appeals (ICA) considered the following equitable factors before precluding litigation based on collateral estoppel:

[W]hether it would be generally unfair in the second case to use the result in the first case, whether assertion of the plea of estoppel by a stranger to the judgment would create [an] anomalous [result], whether the party adversely affected by the collateral estoppel offers a sound reason why he should not be bound by the judgment, and whether the first case was litigated strenuously or with vigor.

*Id.* at 188, 938 P.2d at 1207 (citation omitted) (some brackets added).

Under the circumstances of this case, I believe that it would not be generally unfair to adopt the arbitrator's finding regarding damages in the subsequent tort action. As indicated above, one of the purposes of collateral estoppel is to avoid the kind of anomalous and inconsistent results in the present case, that is, where the arbitrator found that Flores was entitled to compensation for the treatment of injuries resulting from the accident pursuant to the December 1993 Plan and the trial court found that Flores could not recover for the identical treatments. The record reflects that the arbitration award and the damages awarded at trial were well within the insurance policy's limits, demonstrating the shared common interest of Barretto and AIG. In light of Barretto's liability for the accident and AIG's obligation to indemnify Barretto for the civil judgment, AIG is the party ultimately liable for the judgment in the tort action. AIG, as a party to the arbitration, vigorously litigated and actively participated in pre-arbitration and arbitration proceedings, as well as submitted

a post-arbitration brief. In light of the foregoing circumstances and the fact that AIG has not offered a sound reason why it should not be bound by the arbitrator's decision, I would hold that AIG—as the party in the arbitration proceeding and as the party ultimately liable for the judgment in the tort action—is deemed in privity with Barretto. I would also hold that, as in both *Medeiros* and *Tradewind*, application of collateral estoppel does not lead to an unjust result in the present case.

Based on the foregoing, I would hold that, under the facts of this case, collateral estoppel applies, and the trial court was bound by the arbitrator's decision.